## Case No. 13,803.

### TAYLOR v. The ROYAL SAXON.

[1 Wall. Jr. 311.] [1]

Circuit Court, E. D. Pennsylvania.    July 11, 1849.

ADMIRALTY — JURISDICTION — TITLE TO VESSEL — SALE UNDER DECREE—EFFECT ON PRIOR LIEN— LIS PENDENS — CONFLICT OF JURISDICTION.

1. The admiralty jurisdiction of the courts of the United States extends to petitory suits as well as to those merely possessory; that is to say, it may pass upon the disputed title of ships

---

[1] [Reported by John William Wallace, Esq.]

as well as upon the simple right of possession to them.

[Cited in Grigg v. The Clarissa Ann, Case No. 5,826.]

2. A sale of a vessel by order of a court of Pennsylvania under the foreign attachment law of that state, does not divest a lien in the admiralty for seamen's wages, which may accordingly be enforced in the latter court. (The libel in the admiralty was here filed prior to the order of sale in the state court.)

[Cited in brief in Taylor v. Carryl, 24 Pa. St. 261.]

3. The pendency of a replevin in a state court to settle the right of property in a vessel, is a bar to a libel in the admiralty to settle the same right between the same persons; not technically a bar as a plea of lis pendens, but effectively so, to prevent a conflict of jurisdiction.

[Cited in The Oliver Jordan, Case No. 10,503; The Tubal Cain, 9 Fed. 837; The City of Lincoln, 25 Fed. 843.]

[Cited in Fisher v. Whoollery, 25 Pa. St. 199. Cited in brief in Howe v. Freeman, 14 Gray, 568; Leighton v. Harwood, 111 Mass. 69; Smith v. Ford, 48 Wis. 155, 2 N. W. 159.]

"The Royal Saxon," a British barque, arrived at Philadelphia in October, 1847, and on the 17th of November following, Magee issued a foreign attachment from the supreme court of Pennsylvania and attached her as the property of one McIntyre, the defendant in the attachment suit. The sheriff of Philadelphia county executed this writ; placing his officer on board, who retained her in his custody until she was sold as hereinafter mentioned. On the 15th of January, 1848, this same Magee presented his petition to the court from which his attachment had issued, praying a sale of the barque as chargeable, and obtained a rule for her sale, which, after argument in behalf of the captain and owners, was made absolute on the 29th. The barque was accordingly sold by the sheriff on the 9th of February, 1848, when Ward, the real defendant in this suit, bought her for $2,800, and the sheriff delivered her to him. [2] On the 21st January, 1848, Wall et al., mariners, libelled the barque in the admiralty for wages. Process was issued on the same day,—that is to say, eight days before the order of sale from the supreme court,—the marshal returning specially, "Attached the barque Royal Saxon, and found a sheriff's officer on board, claiming to have her in

[2] The process of foreign attachment in Pennsylvania, is a writ by which the sheriff attaches a non-resident debtor by all and singular his goods and chattels * * * in whose possession soever the same may be * * * so that he appear in the court from which the writ issues. "The goods and effects of the defendant in the attachment shall after such service be bound in the hands of the garnishee—(the person in whose possession they are) by such writ," and if susceptible of it shall be taken into possession by the sheriff. After judgment against the defendant, the plaintiff may have execution "of the estate and effects of the said defendant attached as aforesaid." If the goods attached are of a perishable or chargeable nature, the court will order them to be sold. Act June 13, 1836; Serg. For. Attachm. 23.

custody." [Case No. 17,093.] Other libels followed in quick succession: among them one of the 22d January, by the master, for wages: and one on the 25th, by a mariner, for wages. To these libels the marshal made a like return. On the 25th January, 1848, the master of the barque presented to the district judge in admiralty, a petition, reciting the foreign attachment of Magee, declaring his inability to procure bail to relieve the barque; that he had not funds to pay the wages of the mariners; (the mariners having remained with the barque in expectation of continuing the voyage;) that the barque was at a daily expense, and concluding with a prayer that the court would interfere "by ordering a sale of her." To this prayer was appended the approval of the British consul for this port. An order of sale was accordingly issued by the district judge, and on the 15th of February, 1848, she was sold a second time, by the marshal, for $1,600, to Mr. Taylor. At this sale, Ward publickly notified to all persons his title under the sheriff's sale, and that any claim derived from the marshal's sale would be contested by him. The marshal executed a bill of sale and delivered the barque to Mr. Taylor. Mr. Taylor being thus in possession, under the marshal's sale, of the barque which Mr. Ward had bought under the sheriff's sale, the latter gentleman, on the 24th February, 1848, issued a replevin out of the supreme court of Pennsylvania, and having given the sheriff the bond required by law, in double the value of the barque, "conditioned to prosecute the suit with effect and without delay, and for duly returning the barque in case a return should be awarded," the ·sheriff replevied the barque from the possession of Mr. Taylor, delivered it again to Ward and summoned Mr. Taylor as defendant; who responded by causing an appearance to the suit to be entered by counsel. While the replevin suit was thus pending, Mr. Taylor, in his turn, now filed this libel in admiralty (the present suit) for the re-possession of the barque alleging in his libel "that the said barque was wrongfully withheld from him."

On this state of facts, which were all disclosed by the pleadings—the pendency of the replevin being pleaded in abatement, and also generally by way of bar—three questions arose: (1) Has the district court, sitting as a court of admiralty, jurisdiction of this case, or power to entertain a petitory as distinguished from a possessory suit, and ·so determine the question of title to a ship? (2) Did Taylor obtain a good title to the barque as against the other claimants, through the proceedings and sale made to him under the authority of the court of admiralty? (3) If so, can he sustain this suit, notwithstanding the pendency of the replevin suit in the supreme court of Pennsylvania for the same property?

The district judge, was of the affirmative opinion on all three points.

Mr. Waln and G. W. Biddle, for Ward.

This is a petitory suit as distinguished from a possessory one, that is to say, it is a suit whose object is to determine the title of the ship; not the mere possession of it. The English admiralty, at no time since our Revolution, would have entertained such a suit. Sir W. Scott tells us—The Aurora (1800) 3 C. Rob. Adm. 133–136—"that it was formerly held, for a very long time, and down to no very distant period, to be within the jurisdiction of this court to examine and pronounce for the title of ships on questions of ownership. It was not till some time after the Restoration," he says, "that it was informed by other courts that it belonged exclusively · to them. Since that time," he adds, "this court has been very cautious not to interfere at all in questions of this nature." In a prior case (3 C. Rob. Adm. 93) he refused to entertain a suit for possession; the property being litigated and doubtful: and many years afterwards—The Warrior (1818) 2 Dod. 288—he speaks of the admiralty as being "very abstemious in the interposition of its authority on questions of title." In a third case—The Pitt (1824) 1 Hagg. Adm. 242—still later, he says: "It considers itself and is bound to consider itself as moving within very narrow limits, if it proceeds at all, originally, upon a question of title." In Re Blanshard, 2 Barn. & C. 248, the king's bench refused to grant a prohibition to the admiralty ·"to take a vessel from a wrong doer and to deliver it to the rightful owner;" it being assumed by the king's bench that the admiralty would not have proceeded, if the defendants had "pleaded their title." The case of The Tilton [Case No. 14,054], which will be cited on the other side, is in point against us; but it is not binding as authority on this circuit: and the opinions, as to admiralty jurisdiction of the eminent judge (Story) who decided De Lovio v. Boit [Id. 3.776], have never yet received higher approbation than that which he gave to them, at different times, himself. Clerke, whose Praxis Supremæ Curiæ Admiralitatis will be also cited, though a good author, is a very old one; having lived in the time of Elizabeth. He is therefore no authority in a case where a change is asserted to have been made about the time of Charles II.

(2) Suppose this court may pass upon the title, who has the title? The sale under the foreign attachment was a judicial sale; of which the effect is "a transfer of all the rights of property to the highest bidder, so that he cannot be disturbed by lien creditors or mortgagees, who have not made resistance to the decree; nor after sale and confirmation by any claimants of title to any part of the estate levied; because the decree extinguishes (purges) all rights of prop-

erty, mortgages, incumbrances and quitrents in default of opposition." Corporation v. Wallace, 3 Rawle, 109–126; quoting Ferriere, Dict. de Droit, Verbo "Saisie Reellee." This principle which has been adopted from its convenience and justice, by the common law, comes to it in truth from that very system administered here, that is to say, the civil and maritime law. The Madonna Del Burso, 4 C. Rob. Adm. 169. The sale transferred all liens from the barque to the fund produced by the sale of it. This undoubtedly is true in the case of judgments on real estate, or of executions on personalty, where the supreme court constantly refer it to their auditor to settle the right of claimants to the fund. In a leading case (Sheppard v. Taylor, 5 Pet. [30 U. S.] 675, 710) in the supreme court of the United States, the practice was applied in admiralty, and the wages of sailors sustained against the proceeds of the ship which had been forfeited for the acts of the owner. "The lien," says Judge Story, "re-attaches to the thing, and to whatever is substituted for it."

It is vain to say that the interest of the owners in the barque—which was all that the foreign attachment sold—was the barque incumbered by legal liens. It is just as true that an execution creditor who, last of all creditors, levies on personalty, can sell nothing but the defendant's interest, that is to say, can sell only the property subject to the lien of former executions. Yet all prior executions are divested. Indeed foreign attachment is a proceeding in rem. The debtor is attached by "his goods and chattels." The execution is to be out "of the estate and effects of the said defendant attached as aforesaid." It is the thing which is taken possession of and sold; not the defendant's reversionary or resulting interest in the thing.

(3) Admit the general jurisdiction of this court to pass on questions of title, and that Mr. Taylor is the owner. Can this court decide that he is owner? Decide so now, while that very question will be passed upon by the supreme court of the state on a writ of replevin which issued and was completely served prior to the time when the libel here was filed? Technically speaking, perhaps the plea of lis pendens may not apply: for that is pleaded only where the suit is brought by the same plaintiff against the party filing the plea. But the pendency of the suit of replevin is pleaded generally in bar; and the question is not one of lis pendens technically applied, but a question of comity arising under our complicated system of state and federal jurisprudence. Look at the effects in this very case. The marshal of this court is expected to deliver to Taylor the barque which only an hour, perhaps, before, the sheriff of another court had taken from him and delivered to Ward. That the supreme court of Pennsylvania is competent to decide this question of property must be conceded. A replevin is the precise form of action in which to raise the question, and Mr. Taylor has actually appeared to the summons in such a suit. Here then that court had got clear and competent possession of the matter before this court heard of the difficulty at all. Will this court take the matter out of its hands? even if it could do so. But suppose that that court or its suitors should interpose; that Ward again replevies, and that Taylor again files a libel. What is to be the effect? Either an unending and senseless counter-impetration of writs, or else a conflict between this court and the supreme court of the state. To state this case is to decide it; and hence it has passed into a maxim, that in all cases of concurrent jurisdiction, the court that first gets possession of the subject must determine it eventually. Smith v. McIvor, 9 Wheat. [22 U. S.] 532.

The Robert Fulton [Case No. 11,890] is in point. The syllabus is, "The sheriff having attached the vessel under the process of the state court, it was held that the marshal could have no authority to take it out of his possession, but should have so returned to prevent a conflict of jurisdiction." Hagan v. Lucas, 10 Pet. [35 U. S.] 400, applies the same principles to final process, so as to p e-vent "a most injurious conflict of jurisdiction."

F. W. Hubbell and Mr. Hood, for Taylor.

The English admiralty always has maintained (Clerke, Praxis Supremæ Curiæ Admiralitatis, §§ 41, 42), and still does maintain jurisdiction in petitory suits. It is true that in cases involving long and intricate inquiries of fact, which cannot be well decided without the aid of a jury, it has sent the questions of fact elsewhere for trial. But in simple questions of law, whether involving title or possession, it still entertains the jurisdiction. At furthest, it is said to have been "very abstemious in the interposition of its authority," or "bound to consider itself as moving within very narrow limits."

In The Aurora, 3 C. Rob. Adm. 133, and The Warrior, 2 Dod. 288, cited on the other side, Sir W. Scott did consider the question of title; in the former case deciding on its insufficiency: in the other, taking no action upon it. So he did in The Pitt, 1 Hagg. Adm. 240, declining to pass on it from the difficulty of getting at the truth of the facts. The Lagan, 3 Hagg. Adm. 418, though called a cause of possession, was in truth a question of title: the right to possession, indeed, often settles title. The Experimento, 2 Dod. 38, 42, was clearly one of title, though disputed between British and foreign subjects, and Sir W. Scott there denies that the court of admiralty cannot look "a little" into title. In Re Blanshard, 2 Barn. & C. 244, 249 (reported somewhat differently on this point, as Bax-

ter v. Blanshard, 3 Dowl. & R. 177–184), the court of king's bench refused a prohibition to prevent the admiralty taking a vessel from a mere wrong doer and delivering it to the owner: and argue from the higher power of the admiralty "in disputes between owners as to the employment of the ship," that "as part owners of a vessel have a distinct though undivided interest in the whole vessel, they cannot be considered as absolute wrong doers by the act of using a vessel of which they are the proprietors." With regard to the power to settle the title generally, the chief justice, according to the least favourable report (3 Dowl. & R. 177–184), says, "I do not say whether they may or may not try the question of right." The case in the admiralty sought to be prohibited was, as appears by the report of it (The Partridge, 1 Hagg. Adm. 81), a dispute between the original owner of a ship and the purchaser upon a sale by the master abroad. It did therefore involve title. The grounds of the refusal of admiralty to act, are stated by Lord Stowell in The Pitt, already cited. "Where the possession is gained by force and violence, or by a fraud manifest upon the very face of the transaction; or where the party in possession is avowedly entitled only as a minor owner in opposition to the majority of interests, there the court feels no hesitation; but where a course of transactions involving fraud is objected, it declines entering into the question, and leaves it to be determined by the inquiry of courts which have ampler means of arriving at the real truth, and the real justice of the case; for there may be some incidental matters—such as repairs and other expenses, requiring the application of equitable principles which this court may not feel itself competent to administer. I may, therefore, lay it down as a rule for the conduct of this court, that it is only in simple cases, in cases which speak for themselves, that it can act with effect; but in those which, being complex, require a long and minute investigation, it cannot proceed with safety."

The question here is one of mere law; whether a sale under the process of admiralty of a vessel previously sold because of her chargeable nature, while in the hands of the sheriff under an attachment for debt gives the preferable title? It is a question perfectly within the faculties of this court. It has none of the difficulties which made Sir W. Scott "hold his hand and desist from ulterior measures" in The Pitt, where there was "a series of transactions charged on the one side to be fraudulent, and on the other, deemed not to have the slightest mixture of fraud in them:" and where "many documents" were not "forthcoming, which upon such a question ought to be produced." But whatever may be the law in England, the matter must be considered as settled by the investigation and judgment in The Tilton

[supra], where the exact point was decided by Judge Story. This case, if not binding as a technical "authority," will yet receive the highest respect.

What then, next, has Mr. Ward got under his attachment? Nothing more than an execution in it could give him, i. e. the "estate and effects" of the defendant subject to all its infirmities. The defendant had neither "estate nor effects" here, but such as were bound by the lien for wages. The sale has not divested them any more—much less indeed—than it would divest an admitted mortgage on the barque. Reed v. Fawkes, 9 Port. (Ala.) 623, syllabus, is in point. It decides that "a fi. fa. levied on a vessel will not divest a previous lien acquired by the libellant in admiralty."

Indeed, the attachment from the admiralty having been served before the order of sale by the supreme court was made, the possession of the ship was in the admiralty, to which the foreign attachment creditors should have transferred their claim: and the possession of the sheriff as against the admiralty ceased or was suspended, and with it the jurisdiction of the supreme court to order a sale as chargeable. Both officers could not hold, and the title of the admiralty was paramount. The order of sale, therefore, by the supreme court was invalid, and the sale so likewise.

The remarks on the other side about executions and reference to an auditor don't apply. Walters v. Pratt, 2 Rawle, 265–268. When was a lien for mariner's wages ever enforced by a common law court, or any where but through the organs of the admiralty? The idea of sailors being bound by a state court auditor's notice of distribution and so "for ever debarred," is a novelty. Neither is the foreign attachment a proceeding in rem in the sense of the civil or admiralty law, or in any sense other than a fi. fa. is so. It is a mere mode of compelling the appearance of a non resident debtor, by attaching his property and rights of property.

The third point, the lis pendens, is disposed of by Judge Story (Certain Logs of Mahogany [Case No. 2,559]) in a case very similar to this; the libel having been brought to enforce the lien for freight under a charter party. The parties to the replevin, he says, are not the same. The suits are not of the same nature, the replevin being founded on tort; the libel on contract. Then the replevin acts in personam as to the judgment: the libel exclusively in rem. "The admiralty," he adds, "does not attempt to enter into any conflict with the state court as to the just operation of its own process, but it merely asserts a paramount right against all persons whatever, whether claiming above or under that process." Then, again, the plea of lis pendens applies only where the plaintiff in both suits is the same, and both are commenced by himself. The ground of the plea is given by Bac. Abr. tit. "Abatement," M, as being be-

cause "the law abhors multiplicity of actions." It is the duplex vexatio.

As to comity, the case of Certain Logs of Mahogany [supra] is conclusive. The marshal there took the mahogany logs out of the hands of the sheriff: and a process of courtesy is destroyed by a single infraction.

GRIER, Circuit Justice. "It is certainly true," says Lord Stowell, in 2 Dod. 289, in speaking of the high court of admiralty of England, "that this court did formerly entertain questions of title to a greater extent than it has lately been in the habit of doing. In former times, indeed, it decided without reserve upon all questions of disputed title, which the parties thought proper to bring before it for adjudication. After the Restoration, however, it was informed by other courts, that such matters were not properly cognizable here, and since that time it has been very abstemious in the interposition of its authority." As few cases could arise (unless between part owners,) in which the question of possession when entertained would not necessarily introduce as an incident, the question of title, the courts of admiralty in England have been for a time almost wholly deprived, by the unreasonable jealousy of the common law courts, of a jurisdiction which they were peculiarly suited to exercise, and which has been at last restored to them by statute.[3] Recent cases in the supreme court of the United States,—Waring v. Clarke, 5 How. [46 U. S.] 441; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344,—although not directly in point on the present question, show that the courts of admiralty of the United States, have not considered their jurisdiction restrained to the narrow, and sometimes absurd limits lately imposed by the courts of common law in England. Although I am not disposed to go the length of De Lovio v. Boit [supra], I feel no difficulty in giving my assent to The Tilton [supra], which is to the point on the question now under consideration.

2. That the title acquired by Mr. Taylor to the barque Royal Saxon, was good against all the world, will hardly admit of an argument.

The attachment issued out of the supreme court of Pennsylvania, reached only the title of the defendants in the action. The sale by the order of the court, gave no higher title than if sold on an execution of the same court. The purchaser took the title of the defendants whatever it was, subject to the liens or rights attached to the vessel.

The lien for mariners' wages attaches to the vessel, in whosesoever hands it may come, with notice of the claim. It is said to be "nailed to the last plank." If she has been wrongfully seized by belligerents, and restitution of the value is afterwards made, the

mariners' lien will cleave to the proceeds. Brown v. Lull [Case No. 2,018]. The proceedings in the state court were not in rem. The rights of the mariner against the vessel can only be prosecuted in a court of admiralty which proceeds in rem, and has exclusive jurisdiction of the subject matter. The vessel is not attached as the debtor, but the property or right of the defendant in the suit is distrained to compel his appearance. The purchaser in the state court might have intervened in the district court, and released the vessel by entering stipulation with sufficient sureties to satisfy the liens. He bought with full notice; for the proceedings in the district court were pending at the time of his purchase. If he has suffered a sale in the admiralty for liens which adhered to the vessel when he bought her, his title is divested as completely as if he had bought lands on execution which were afterwards sold on a mortgage which was the oldest lien upon the property.

The case of Certain Logs of Mahogany [supra] is directly in point as to this question. There, it was decided that the pendency of a replevin, in which the title and possession of the property was litigated, was no bar to the prosecution in admiralty of a claim which was a lien on the thing, and sought a remedy against it, irrespective of possession, ownership or title. To this extent we concur fully with the learned judge who decided that case, but it has been cited to support doctrines in which we do not concur, and which were not intended to be advanced by the court in that case, and which we shall notice more fully hereafter.

For these reasons, I feel no doubt of the correctness of the decision of these two questions by the learned judge of the district court.

On the third point stated, I am sorry after much reflection and examination, to be compelled to differ from that court.

The plea of lis pendens, in courts of common law, will be allowed to abate the writ only where the first suit is brought by the same plaintiff against the same defendant for the same cause of action. It is founded on the principle that the law abhors a multiplicity of actions, and that to allow a man to be twice arrested or twice attached by his goods for the same thing would be oppressive. It is plain that the plea in this case could not be sustained on these technical grounds, as plaintiff or libellant in this suit was defendant in the replevin suit instituted by the claimants in the supreme court of Pennsylvania.

But, I apprehend, the question before us depends on broader and different principles, and such as will support this plea either in abatement or in bar.

It will not be denied that the courts of Pennsylvania have full power and jurisdiction to seize a ship lying in the port of Philadelphia with a writ of replevin, and to de-

---

[3] St. 3 & 4 Vict. c. 65. § 4. expressly authorizing the admiralty "to decide all questions as to the title to, or ownership of any ship or vessel, arising in any cause of possession or otherwise."

cide the question of possession and property between the parties claimant. And although it has been denied, and probably will be hereafter, that the district court as a court of admiralty, has the same jurisdiction, to decide the question of title, we will assume that question as settled, at least for the purposes of the present case.

We have then, two equal and independent tribunals with concurrent jurisdiction of the parties, and the subject matter in contest.

The state court has first taken cognizance of the question of possession and property between these parties. And if it were an action of trespass where the same question might be collaterally decided in a suit by A. against B. in one court, that might arise in a suit by B. against A. in the other, it may be admitted that the pendency of such a suit in one court, would be no bar to a proceeding in the other, merely because the same question was involved and might be decided.

But we have something more. The state court has taken possession by her officer of the thing, or subject matter in controversy, and disposed of it according to law. It is true the court have not decided the question of property between the parties; that is still pending; but until that question is decided the possession of the matter in dispute is disposed of according to the law of the land.

Originally the action of replevin was a remedy for an illegal distress; and when the property distrained was delivered to the plaintiff on a writ of replevin, it became as much under his control, and as liable to be taken in execution for his debts, as his other property. The bond is substituted in court in place of the thing distrained, and the lien of the distress is gone. Woglam v. Cowperthwaite, 2 Dall. [2 U. S.] 68. In Pennsylvania a writ of replevin lies in all cases where one man claims personal property in possession of another. But the same consequences must result when the distress or taking is only fictitious, and the title and right of possession are the real matters in dispute. By virtue of the writ of replevin, the sheriff seizes the property; it is taken into the custody of the law. But as it would be injurious to both parties that the property should be so retained, the sheriff is ordered by the writ to deliver it into the custody and possession of the plaintiff, on his giving sufficient pledges. If the defendant or party in possession claims title, the sheriff does not hold an inquisition to try the question nor does any writ de proprietate probandâ issue; but the defendant is allowed to retain the possession by giving what is called "a claim property bond." When this is done, the suit proceeds as a common action of trespass de bonis asportatis. The plaintiff recovers in damages the value of the property, and the only advantage which he gains by his action of replev-

in, is the security which he has obtained for the damages he may recover. The delivery to the defendant is final; no retorno habendo ever issues for delivery of the specific thing to the plaintiff, or withernam to compel it. In fact, whatever the defendant's title may previously have been, it becomes indefeasible by his "claim property bond," which is substituted for the property, and has the effect, like a recovery of damages in trespass, to confer a good title on the trespasser. If the sheriff were to deliver possession to the plaintiff according to the letter of the writ, without any judgment of the court on the question of title, or any inquisition by the sheriff, or writ de proprietate probandâ without out regard to the defendant's claim of title, it is plain that very great abuses might be committed.

But practice has shown that these abuses are sufficiently restrained by giving the person who has the actual possession, which is prima facie evidence of title, the first right or refusal, of taking the property into his possession during the contest about its title, and in fact of perfecting his title as against the plaintiff in the writ, by substitution of his bond.

But if the person in possession and claiming title, does not desire to retain it on these conditions, the sheriff in obedience to the command of his writ, delivers the thing seized to the plaintiff, taking sureties or pledges for the ultimate sufficiency of which the officer and his sureties are liable.

The plaintiff having thus obtained the possession by process of law, has the legal possession. The title of his antagonist is transferred to him in consideration of his bond, liable only to recaption if found in his possession by a writ of retorno habendo. In practice, this writ is seldom or never resorted to, unless to have the formal return of "elongatur."

If the plaintiff has sold and delivered the property to another, the sheriff cannot seize it on a writ of de retorno habendo: but if not found in possession of the plaintiff, he must necessarily return his writ "elongatur."

If ever a case should arise, in which the restoration of the identical property for some peculiar reason, should be preferred to a recovery of its value, a writ of withernam would lie to compel the plaintiff to restore it, and if he had sold it, to purchase it again. But whether the replevin be to restore a real or fictitious distress, the title and possession of the plaintiff to the things are considered as good and defeasible only in case of recovery by defendant, and a reseizure on writ of retorno habendo.

The plaintiff's replevin bond has been substituted in the court by consent of the defendant, and by process of the law, for the property in dispute: if the plaintiff prosecute the suit with effect, or if the defendant recover his damages, the title of plain-

tiff is absolute and indefeasible, and his possession continues to be legal till taken from him by process of the same court which gave it to him.

But on this subject we are not without cases directly in point, which confirm the views here taken. In the case of Morris v. De Witt, 5 Wend. 71, it has been decided that a writ of replevin by defendant to obtain a re-delivery of the property taken from him by virtue of a writ of replevin issued against him, is irregular and will be quashed. The court say: "The law has provided guards against abuses in practice under the writ of replevin. It would be a very useless proceeding, if the defendant in replevin has a right to turn round and bring his action of replevin, and thus regain possession of the property which has been legally taken from him. If such a proceeding were permitted, there would be no end to suits, and the benefits of this action would never be realized. The title to the property in question must be tried upon issue regularly joined, and until such trial, the party from whom the property has been taken by due process of law, must remain out of possession, unless it is restored to him on his claim of property."

Lowry v. Hall, 2 Watts & S. 129, also asserts and confirms the views which we have taken. A raft of lumber had there been delivered to Lowry on a writ of replevin, in which Hall and others were defendants, in the state of New York. When the raft was brought into Pennsylvania, Hall took out a replevin here, Lowry pleaded the delivery to him on a replevin in New York, as conclusive evidence of his title, and a bar to a second replevin between the same parties in this state. The court below decided that an adjudication of the question of property in New York would have been conclusive, but the mere pendency of an earlier replevin there was not. The supreme court reversed the judgment, on the ground that whatever may have been the previous rights of the parties, after the delivery in replevin to one of the parties, he had not only the right of possession but of property also, till actual re-delivery by process from the same court. "After the execution of the first replevin, then" asks Chief Justice Gibson "who had a right to the possession of this lumber by the law of New York? Unquestionably not he from whose possession it had been taken by the authority of that law and committed to the custody of an antagonist claimant, to abide the event of the suit." Again, he remarks, "it is unnecessary to contend that his title becomes absolute in form by the eloignment, for it is enough that the ownership is taken to be in him, till his title is disproved by the trial of the issue. But the property has been delivered to him as his own, on the basis, real or supposed, of having been wrongfully taken from him, and as possession is primâ facie evidence of title,

delivery to him, after a claim of property which admits the taking, is so too; at least it settles the right to treat it as his own, till it be adjudged to belong to another.

It is clear, therefore, that the supreme court of Pennsylvania would not have entertained a second replevin, if Mr. Taylor had brought his suit in that court; not only because it would be oppressive to compel the opposite claimants a second time (and if a second, then any other number of times,) to give sureties for prosecuting their claim to the barque, but because, by operation of law, the proceedings in the first replevin, have vested the right of possession in the party to whom it was delivered in the first writ. The pendency of the first replevin, would therefore be a valid plea, not only in abatement but in bar. And if the second replevin had been issued in the district court of the city and county of Philadelphia, which has concurrent jurisdiction with the supreme court, it is plain that they must sustain the plea, not only on the well established principle "that in cases of concurrent jurisdiction, the court which first has possession of the subject must determine it conclusively" (Smith v. McIvor, 9 Wheat. [22 U. S.] 532), but because the pendency of the first writ shows conclusively that the party in possession has a legal possession, which the plaintiff in the second replevin is estopped to deny; the disposition of the property by the law during the pendency of the litigation, being as conclusive on the parties as the final decision of the court on the question of title. These points being (as we think) conclusively established, it remains only to inquire whether a court of admiralty, a court of concurrent jurisdiction receiving her authority from the United States, is bound by the same rules of comity and of law, or may disregard the disposition made of the property now in dispute by the law and courts of Pennsylvania, and anticipate the decision of a controversy already submitted by the parties to the state tribunal.

The court of king's bench in England, treating the court of admiralty as an inferior tribunal, have refused to sustain a plea in abatement, that the plaintiff had libelled the defendant in admiralty, for the same cause of action. Bac. Abr. tit. "Abatement," M. But while the supreme court (the king's bench) of Pennsylvania, could not treat the court of admiralty deriving her power from the United States, as an inferior court, so neither can the latter disregard the pendency of process in the state courts, where they have concurrent jurisdiction. The principle that the first tribunal which has possession of the subject matter should be left to determine it conclusively, is not founded on mere comity, but on necessity and to avoid the unpleasant collision of jurisdictions which would otherwise ensue. Where, as in the present case, the courts derive their power from different sovereigns, there is the great-

er reason and necessity, why "uberrima comitas" (if I may be allowed the phrase,) should be observed to avoid a conflict. It would exhibit a humiliating spectacle, to have a ship delivered by the state officer to Ward yesterday, restored to Taylor by the court of admiralty to-day—to be re-taken by process from the state court to-morrow, and so on alternately.

The fact that the title of one party was acquired under the judgment and process of the court of admiralty, and that of the other under the state court, furnishes no reason why either court should consider itself bound to warrant or sustain the title emanating from it. It is to be presumed that justice will be administered according to law, in either court, and Mr. Taylor's title, and the well known principles of maritime law on which it is founded, will be sustained in the state court, as well as here.

But it is denied that this is a case of concurrent jurisdiction, because of the different form and course of proceeding in a court of admiralty. This proceeding it is said is in rem, that all the world is a party, while the action of replevin is a mere personal action of trespass; that in the one case, the thing passes into possession of the court, in the other, the delivery is made by the officer without any order or judgment of the court.

These distinctions, though ingenious, do not constitute a difference or furnish an argument to justify the court of admiralty in disregarding the disposition made of this property by the law of Pennsylvania, whether it be temporary or final. By that law Ward has a good title to the possession of this property as against Taylor, till the court by whose process it was delivered to him, shall award a return of it.

And why is not the process of replevin as much a proceeding in rem as the petitory or possessory action in the admiralty? The forms of process and course of proceeding will differ of course, one being modeled on the common law and the other on the civil law. The caption of the suit in one case is against the thing, with a citation to the parties claiming and in possession, whoever they may be found to be. In the other, the claimants are first ascertained and made the parties at once. In either case, the officer of the court takes the subject matter in contest, into his possession. In admiralty, the court order it to be delivered to one of the parties during the contest, on his stipulating with sureties; in the state court, the officer delivers it to one of the parties according to fixed rules of law. In either case, the thing itself is disposed of by the legal process of the court, and the question of title is afterwards contested. In admiralty, where cases are more speedily decided, the property is often detained till a decision of the question of title, and is then delivered to the successful party.

It is true, that the court of admiralty, from the peculiarity of her process and modes of proceeding, is more competent to render speedy and exact justice to the parties, than the courts of common law, (more especially in disputes between part owners,) but it cannot, on that assumption, disregard their acts and process, or anticipate their decisions. The proceeding in the one court, is in fact just as much in rem as in the other. The barque has been seized by the officer in each court, and has been delivered to one of the claimants, during the pendency of the litigation. And neither court has a right to disregard the process or judgment of the other.

The delivery by the sheriff in one case, is as conclusive between the parties, as the interlocutory order or judgment of the admiralty in the other.

The case of Certain Logs of Mahogany, already noticed, has been relied on as authority for supporting the judgment of the district court on this point, and if this were a proceeding against the vessel to enforce a bottomry bond or mariner's wages, which follow the vessel, whether the party in possession has taken it by writ of replevin or in any other way, that case would be an authority to which we would willingly assent. But the point now before us did not arise in that case, nor can we receive the arguments used by the learned judge, which were conclusive in the case before him, as having any bearing whatever on the point now under consideration.

Judgment with costs accordingly.

[See Taylor v. Carryl, 20 How. (61 U. S.) 583; Id., 24 Pa. St. 261.]