# Thomas Speer

*v.*

# Benjamin H. Skinner.

1. Chattel mortgage — *may secure future advances.* A chattel mortgage given to secure an existing debt and future advances, is valid, if *bona fide.*

2. And it is not essential to the validity of such a mortgage that it should show upon its face that it was intended to secure future advances. It is only necessary in any such case, that the mortgage debt should be described with such certainty, as to enable subsequent creditors and purchasers to ascertain, either from the condition of the deed or inquiry *aliunde,* the *extent* of the incumbrance.

3. In this case, it was set forth in the mortgage that it was given to secure a note executed by the mortgagor for ten thousand dollars, when in fact no debt to that amount then existed, but it was shown by a separate instrument that it was designed as a security for subsequent advances expected to be made. The mortgage was held to be valid, and, from its face, the presumption was, that it was for a present debt of ten thousand dollars due, and to that extent subsequent incumbrancers and purchasers would have notice, by the record, of this prior incumbrance.

4. But it has been held in this State, that in such a case the mortgagee can only recover the amount actually due at the date of the sale of the equity of redemption.

5. Distress for rent — lien — *how lost.* Where goods are taken in distress for rent, and replevied, the distrainer loses his lien upon them, and is left to his remedy on the replevin bond.

6. Replevin bond — *to whom it may be given.* Where property is replevied out of the hands of the sheriff, a bond executed to the coroner who served the writ, is valid and binding. The statute naming the sheriff as the party to whom the bond is to be given, means only that it shall be given to the officer serving the writ.

7. Witness — *competency.* A party signing a replevin bond is not a competent witness in a suit involving the ownership of the goods replevied.

Writ of Error to the Circuit Court of Cook county; the Hon. E. S. Williams, Judge, presiding.

The facts in this case appear to be, that Isaac Speer being the owner of the Metropolitan Hotel in Chicago, leased the same on the first of July, 1856, for ten years, to Goodman and Mason, who owned the furniture, at a yearly rent of eleven thousand dollars for that portion of the building occupied as a hotel, and for other portions of the building, additional rent was stipulated

to be paid.   In each lease is a clause that Speer should have a just and valid lien on all the goods and chattels of Goodman and Mason as security for the payment of the rents, any law to the contrary notwithstanding; nor would they underlet the premises or assign the lease without Speer's written assent.

On the 14th of January, 1857, Goodman and Mason, having conducted the hotel more than six months, executed to F. H. Benson, a banker with whom they dealt, a mortgage on the furniture, to secure a note of the same date, for ten thousand dollars due in one year, with ten per cent. interest.   On the fifth of November, 1857, Goodman and Mason sold the furniture to Gates subject to this mortgage.   Benson, in the mean time, had taken in a partner, one Kingsbury, and he, with Kingsbury, on the 14th of October, 1857, made an assignment for the benefit of their creditors, to John L. Beveridge and William P. Moss, and were insolvent.

On the 14th of January, 1858, the day the note and mortgage to Benson matured, Beveridge and Moss declared the conditions thereof broken, entered the hotel and undertook to take possession.   On the 20th of January, Goodman and Mason and Gates filed their bill against Benson and Beveridge and Moss in the Cook Circuit Court, and obtained an injunction, enjoining them from proceeding until the further order of the court.   The ground of the application was, that the mortgage and note were given to Benson as collateral security only, for the payment of any indebtedness then existing, or which might thereafter accrue to Benson as banker, and that Benson gave a receipt to that effect, and when paid, they would surrender the $10,000 note, the mortgage to stand only for balance of indebtedness.

Goodman and Mason, during the months of August and September, 1857, made their four promissory notes, two dated August 12, at sixty days, for two thousand dollars each; one dated August 27, at ninety days, for one thousand dollars; one dated September 8, at thirty days, for fifteen hundred dollars; and on August 27th they made another note of fifteen hundred dollars, at ninety days, as collateral to one of the notes

of two thousand dollars; that these notes were discounted and placed to their credit, and that Benson and Co. failed with a credit on their books in favor of Goodman and Mason of about twenty-five hundred dollars; they, Benson and Kingsbury, negotiated these notes and they had passed into the hands of *bona fide* holders.

The object of the bill was to restrain Benson and the others from taking possession, complainants alleging that they have no guaranty that the proceeds would be applied to these notes, and they prayed that an account might be taken between them and F. H. Benson and F. H. Benson and Company; that it might be settled and adjusted; that the balance might be ascertained, and that the mortgage might be declared and decreed a security for such balance only. An injunction was granted, and Thomas Speer became one of the sureties in the injunction bond.

Pending this bill, B. F. Haddock, by leave of the court, presented a petition or bill of interpleader, setting forth that he was the holder of one of these two thousand dollar notes of Goodman and Mason, which they alleged to be outstanding, and asking the benefit of the security. This bill was answered by Benson and Beveridge and Moss, admitting Haddock's bill to be true, and agreed that Haddock should have a decree and sale, to include a balance of three hundred dollars found due to F. H. Benson and Company, which was assigned to Haddock. This decree was made in favor of Haddock in March, 1860, and was for this two thousand dollar note and interest, and the three hundred dollar balance. Under this decree Granville Kimball was appointed receiver, and was ordered to sell the property in default of its payment. He made sale, reported it to the court, and the court confirmed it. Haddock was the purchaser at $3,291.20, and is the property described in exhibit B, and made a part of appellee's bill. Haddock got into possession of the hotel, and Gates occupied under him, promising to pay rent to Haddock.

These proceedings are denounced by appellant as fraudulent, and had and contrived of malice, covin and collusion, with

the intent and purpose to delay, hinder and defraud them out of their just demands and rents.

Pending this suit, Isaac Speer, the landlord, made an assignment for the benefit of his creditors to Thomas Speer, and default having been made in the payment of the rents, he issued distress warrants and levied on this furniture. One of the warrants was dated March 20, 1858, for seven thousand eight hundred and ninety-three $\frac{84}{100}$ dollars, the other July 28, 1858. Gates, claiming under his purchase from Goodman and Mason, on the suing out of these warrants, immediately replevied the property, gave security according to the statute, and the property was surrendered to him. These replevin suits were tried in May, 1861, and a judgment recovered against Gates, and a writ of *retorno habendo* awarded, Speer having, in November, 1858, had his claim on the distress warrants tried, and received a certificate of the amounts due. Gates, on the 31st May, 1859, executed to Haddock a mortgage to secure a note of one thousand seven hundred and forty-four $\frac{66}{100}$ dollars, of the same date, and payable with ten per cent. interest one year after date. It seems Haddock had levied a distress warrant against Gates for rent due, and released it on Gates giving this note and mortgage. Default having been made in the payment of this note, Haddock, in October, 1860, proceeded to sell the property by posting notices in three of the most public places in Chicago, more than ten days before the sale, and on the ninth day of November, 1860, J. A. Marshall, as auctioneer under the direction of Haddock, at the Metropolitan Hotel, made the sale. On the day before, he had made a sale at the request of Granville Kimball, the receiver, appointed under the decree of March, 1860, in the bill of interpleader, in the injunction case of Goodman and Mason and Gates against Benson and Company. This sale embraced a part of the goods mentioned in the mortgage from Gates to Haddock. The balance not sold at the receiver's sale on the 8th was sold under the mortgage on the 9th. At this sale, appellee, Skinner, became the purchaser. Haddock arranged with the auctioneer for the purchase-money. When

it could be done so as to fetch the best price, the articles were sold separately. They were sold for cash in the usual manner. Marshall made out the bills for the goods sold at the receiver's sale. Haddock did not become the purchaser of all the goods at that sale. Some three hundred dollars' worth were sold to other parties which Haddock repurchased, and a bill was made out to him for them; both the Speers, Isaac and Thomas, attended the first sale, and Thomas the second but a moment, but Isaac was present at the last sale; the auctioneer does not remember that they forbid the sale, but Isaac Speer objected, at the first sale, to his selling in the large quantity he was then selling at. At the second sale, Isaac Speer came into the dining room and forbid the sale, stating that if any one purchased, he did so at his peril. Appellee was present when Speer objected. The auctioneer was then selling a bed, bedstead and the bedding of one bed for so much for the lot. A bill of sale was executed by the auctioneer to appellee, the consideration expressed being two thousand six hundred and seventy-four $\frac{95}{100}$ dollars.

On the fifteenth of November, 1860, Waite, the cashier of one of the banks, paid Haddock, on appellee's check, this amount; the check was returned to appellee when his account was made up; the money to pay it had been deposited by appellee, at various times, in small sums; he had that amount in the bank in his own name; had been depositing six months or a year; Haddock took the money from the bank and did not redeposit it.

These are the goods and chattels described in Exhibit A, made part of appellee's bill.

Thus is seen the nature of appellee's claim to the property. First, by the purchase by Haddock, under the receiver's sale, of the goods described in Exhibit B, and next, by the purchase under Gates' chattel mortgage to Haddock, of the goods described in Exhibit A, as before mentioned.

When Goodman and Mason and Gates sued out their injunction to restrain Benson and Company from interfering with this property, Thomas Speer, the appellant, signed their injunc-

tion bond as surety, and, consequently, had knowledge of the pendency of the suit.    This was before the levy of the distress warrants.

The Circuit Court decreed the property to be the property of Skinner, and made the injunction perpetual.

To reverse this decision, Speer prosecutes this writ of error, and assigns for error the following :

1.    The court erred in sustaining the complainant's motion to exclude the several depositions of Isaac Speer and Joseph Smith.

2.    The court erred in excluding Joseph Smith's deposition.

3.    The court erred in excluding the deposition of Isaac Speer, taken in this case, and also in excluding the affidavits of John A. Nelson and Jas. A. Marshall from being read as evidence.

4.    That the decree of the said court in perpetuating the injunction in this case is wholly erroneous in substance and form, and in every branch and part thereof; and that said injunction should have been *dissolved* and the bill dismissed with costs.

Mr. B. S. MORRIS, for the plaintiff in error, made the following points :

1.    Was Gates the general owner of the goods he mortgaged to Mr. Haddock, described in "Exhibit A," and afterwards alleged to be sold by Haddock to Skinner ?    *We answer, No.*

This *fact* was clearly established by a direct issue thereon in the *replevin suits*, and a verdict and judgment thereon ; that he was not the owner, was tried and determined against him. In the other, Haddock so admitted, by his stipulation to let a judgment go for the return of the goods to be sold, and the proceeds applied as part payment of rents due Speer.    The judgment or a decree of a *court* of competent jurisdiction, is *conclusive*, whenever the *same matter* is again brought in controversy.    See *Hopkins* v. *Lee*, 5 Peters C. R. (U. S.), 25. "Hence the *verdict* and judgment of a court of record puts an

*end* to all further controversy concerning the *points* thus decided."

2.  Was the mortgage by Goodman and Mason valid at its execution, or absolutely void? We say, the latter. Fraud *vitiates* every transaction. "*Upon a conceded state of facts, fraud is a question of law.*" However honest the *intentions* of the parties may have been, their *acts* are such, in my judgment, as cannot be *sustained* against the creditors of the mortgagor. The mortgage is for $10,000; while, in fact, the pleadings and proof, show there was no *such existing* debt at the time. The note was made and delivered, without any good or valuable consideration whatever. But it is said the mortgage and note were given to secure *future advances,* etc.; yet this does not *so appear* in the mortgage. The mortgage therefore recites a *falsehood,* as admitted and shown by the proof. The mortgage and note are *absolutely* void as to Speer, the creditor. *Divers* v. *McLoughlin,* 2 Wend. 599, *in point.* Besides our statute declares these mortgages must "*be bona fide,*" to be available against a creditor, otherwise they are void as to creditors.

3.  The court erred in making a decree, when two main charges in the bill were not only not proved, but actually *disproved.* 1st, that Speer pretends to have some claim on the goods, and by virtue of some process against the *goods of Gates,* but which process and *claim* is, in *all respects, subject* and *subsequent* to *his* and *Haddock's.* Speer denies these charges, and we have shown conclusively by the verdict and judgment aforesaid that the goods, etc., were the property of Goodman and Mason, distrained by Speer, lawfully to pay his rents, and never was the property of Gates, Haddock or Skinner. The seizure was in April, 1858, and the mortgage in 1859, subsequent. The mortgage was subject and subsequent to the levy of the warrants.

4.  Whether the coroner, by receiving the replevin bond and security therein, has the effect to release the goods and chattels from the levy and lien of the warrant of distress, so far as to enable the plaintiff in the suit to mortgage the same, free from

the seizure, and whether the alleged sale of goods, by the mortgagee, to the purchaser, under such mortgage, can hôld the same against the levy, with or without notice of such levy to such mortgagee or purchaser?

We have no doubt such mortgagee or purchaser, with notice of the seizure and pendency of the suit, cannot hold the property from the officer with the writ of *retorno habendo*, etc. 3 Ham. 268; *Steel* v. *Lowry*, 4 Ham. 77, 75; Wilcox Cond. Ohio R. 720, 721.

And under our *statute*, giving these remedies by distress, *in rem*, such bond is not substituted for the property; so as not to give two actions to do what the first intended should be done, by an expeditious and easy remedy for the collection of rents. *Brush* v. *Seguin et al.*, 24 Ill. 256; *Kline's case*, 1 Scam. 343.

5. No injunction will be granted where it will *operate oppressively* or *inequitably*, or contrary to *justice* of the case. Story Eq. § 959 *a ;* 22 Ill. 36.

It is never granted where the legal title is not *clear*. 1 Ves. 188 ; 37 N. H. 260 ; 25 Ill. 453.

Messrs. WAITE & TOWNE, for the defendant in error.

1. By levying the distress warrant, Thomas Speer did not acquire a property in the goods, but only a lien. The general property was either in Gates, or Goodman & Mason. 9 New Hampshire, 488. A conveyance of property, even if in fraud of creditors, is a valid conveyance except as against the creditors of the vendor, and as to them it is only voidable, not void. The general property is in the vendee, subject to the right of the creditors of the vendor, when the conveyance is fraudulent, to levy execution upon it. Even if the sale of Goodman & Mason to Gates was in fraud of creditors, it was not a void, but only a voidable sale, and whoever *bona fide* acquires title by mortgage or sale from Gates must hold the property, even as against the creditors of Goodman & Mason. When Gates replevied the goods and gave bail according to the statute, the

lien of Thomas Speer, by virtue of his distress warrant, was discharged and lost, and Gates could mortgage or sell them. This doctrine is abundantly sustained by the following authorities : 2 Brown's C. R. 427; Morris on Replevin, 170–172; 2 Dallas, 131–138; Bac. Abr. 547; 25 Wend. 614; 1 Conn. 163; 11 Wis. 380.

2. A mortgage to secure future advances is valid. 13 Ill. 254, and cases there cited.

Our statute, in regard to chattel mortgages, does not forbid such mortgages to secure future advances, and there is certainly nothing in the equity of the case which should forbid it. But it is said that the note of $10,000 and the mortgage, did not show the true transaction, and is therefore invalid. Mortgages given to secure future advances drawn in the same way, have been upheld and sustained in the following cases : 13 Ill. 259; 7 Ala. 143; 5 Binney, 585; 2 Sandf. Ch. 80. This last case is strictly in point. 2 Cowen, 246; 7 Cranch. 34; 5 Johns. Ch. 320–326. This last case is that of a judgment entered. 23 How. 15.

Mr. J. B. THOMAS, for the plaintiff in error, in reply, denied that the landlord who had distrained the goods for rent, had lost his lien by reason of the replevin, and cited *Lusk* v. *Ramsay*, 3 Munf. 427; 11 Wis. 380; Story's Eq. Jur. §§ 422, 1257, 1265.

The counsel also insisted the mortgage to Benson was void, being to secure an apparent debt of ten thousand dollars, when no such debt was due, but was designed to cover future advances, citing 2 Seld. 161; 7 Johns. Ch. 14; 19 Ves. 447; 3 Barb. Ch. 293; 4 Kent's Com. 176; 23 Ill. 603.

He also contended that the replevin bond given to the *coroner* was void upon its face, and cited 1 Comst. 164; and laid down these propositions :

1. By our statute, sheriffs alone are expressly authorized to take a bond. R. S., 1845, p. 434, sec. 4.

A bond taken in his official capacity by an officer unauthorized, is void. 19 Ill. 439.

2. A replevin bond made *to a person*, or *on a condition* not required by law, is void. 5 Pick. 227; 3 J. J. Marsh. 180; 5 B. Mon. 112.

3. The writ in this case was unlawfully directed to the coroner, and therefore a bond to indemnify him in executing it was illegal. 5 Pick. 227. The right of the coroner to execute process is *special*, depending on a contingency. A writ, therefore, directed to him, which does not, on its face, show the existence of the contingency required, is illegal and void. R. S., 1845, p. 517, sec. 18; 21 Pick. 536; 19 id. 340; 6 Conn. 139; Crocker on Sheriffs, § 950.

The coroner's duty to execute writs arises only where he acts as sheriff *ex officio*, during a vacancy of that office, or where just exceptions can be taken to the sheriff or his deputies, or affidavit is filed of their partiality, prejudice or interest. In this replevin suit neither the sheriff nor his deputies were parties, nor is there any affidavit or other evidence in the record tending to show any partiality or interest on their part in suit. The writ was, therefore, improperly directed, and the bond taken upon it, void. 5 Pick. 227; 3 J. J. Marsh. 180.

Mr. Justice Breese delivered the opinion of the Court:

The questions raised by plaintiff in error are, first, as to the *bona fides* of Goodman and Mason's mortgage to Benson and Company of this furniture.

No objection is made, in the answer of plaintiff in error, to this mortgage, on account of its having been given to secure future advances, but it is charged to be fraudulent, — made with a design to deprive them of the collection of their rents.

Although the objection stated is not made in the answer, yet it is made in the brief of plaintiff's counsel, and argued at great length, and we will consider it.

They insist that the mortgage, being made to secure an apparent debt of ten thousand dollars, when no such debt in amount was due, was void. Though they admit that such a mortgage on real estate might be valid although it be not so

expressed in the deed, yet the doctrine cannot apply consistently with our statute to chattel mortgages, it being an essential element in such conveyances, that the possession must be consistent with the deed, and it must be *bona fide*, otherwise the property remains subject to the rights of creditors. They ask, how can a creditor avail himself of the rights the law gives him if the deed does not show when the debt matures, and, consequently, when the retention of the goods by the mortgagors becomes unlawful. In the case of *Truscott* v. *King*, 2 Seld. 144, to which appellants refer, it was said, the principle was well established that a mortgage or judgment may be taken and held as security for future advances and responsibilities *to the extent of it*, when that forms a part of the original agreement between the parties; and the future advances will be covered by the mortgage or judgment in preference to the claim under a junior intervening incumbrance, with notice of the agreement. In this case all the authorities are reviewed by the court, and among them is the case of *James* v. *Johnson*, 5 Johns. Ch. 417, wherein the chancellor said, that, in many cases, a subject pledged for a debt might be considered as a security for further loans, and that he saw no possible objection to it if no intervening right exists to prevent the justness of the application of the rule.

In the case of the *United States* v. *Hove et al.*, 3 Cranch, 73, MARSHALL, Ch. J., says: That the property stood bound for future advances was, in itself, unexceptionable. It may, indeed, be converted to improper purposes, but it is not positively inadmissible. It is frequent for a person who expects to become more considerably indebted, to mortgage property to his creditors as a security for debts to be contracted, as well as for that which is already due. And the same was held in the case of *Shirras et al.* v. *Caig and Mitchell*, 7 Cranch, 34. In this case the same eminent jurist said, "It was true, the real transaction did not appear on the face of the mortgage, and that it was not to be denied that a deed which misrepresents the transaction it recites, and the consideration on which it is executed, is liable to suspicion.

That it must sustain a vigorous examination. That it was always advisable, fairly and plainly, to state the truth. But if, upon investigation, the real transaction should appear to be fair, though somewhat variant from that which is described, it would seem to be unjust and unprecedented to deprive the person claiming under the deed of his real equitable rights, unless it be in favor of a person who has been in fact injured and deceived by the misrepresentation."

In the case of *Conrad* v. *The Atlantic Ins. Co.*, 1 Peters, 447, STORY, Justice, said, that mortgages might as well be given to secure future advances and contingent debts, as those which already exist and are certain and due. A large number of other cases, to the same effect, are cited by the court, and among them the case of the *Bank of Utica* v. *Finch*, 3 Barb. Ch. 293, also cited by the appellants on their brief.

In that case, it was held, that where a bond and mortgage were given to secure a particular debt mentioned therein, the mortgagee could not, as against subsequent purchasers or incumbrancers, hold it as a lien for an entirely distinct and different debt, upon parol proof that it was intended to cover that debt also. But that a mortgage or judgment might be given to secure future advances and responsibilities, or as a general security for balances which might be due, from time to time, from the mortgagor or judgment debtor. That such security might be taken in either form for a specific sum of money, large enough to cover the amount of the floating debt intended to be secured thereby, and such future advances and responsibilities will be protected by such security, to the extent of the sum mentioned therein, in preference to any claim under a junior incumbrance with notice, although such security, on its face, does not specify that future advances or responsibilities to be made or incurred are provided for in such sum. Parol evidence is admissible to show the purpose and intent for which such security was executed, and it does not conflict with the principle that such evidence cannot be admitted to contradict the written instrument. But neither a mortgage nor judgment can be rendered available to secure the party taking them for future

advances or responsibilities, by any subsequent parol agreement, in preference to the lien of a junior incumbrancer.

On the principle of these cases, of the last especially, the mortgage having been recorded, from the face of it, the presumption must be, that it was for a present debt of ten thousand dollars, due, and, to that extent, subsequent incumbrancers and purchasers would have notice by the record of this prior incumbrance.

In the case of *Craig* v. *Tappin*, 2 Sandf. Ch. 78, the court said, that mortgages to secure future advances are good to the extent secured thereby. And in answer to a similar objection made by the appellants here, the court say, if, in this instance, the mortgage had stated that it was designed to secure future advances, the subsequent creditors or incumbrancers would obtain no useful information from that statement. So in any case, the record would afford him no certainty. His only resource would be, an application to the mortgagee, to ascertain the extent of the advances already made, very much as in an ordinary transaction, when, finding a large lien before him, he would inquire of the creditors, whether all or how much of it was due.

This mortgage to Benson, showed on its face, by the record, the utmost amount or sum which it was intended to secure. It is only necessary in any such case, that the mortgage debt should be described with such certainty, as to enable subsequent creditors and purchasers to ascertain, either from the condition of the deed or inquiry *aliunde*, the *extent* of the incumbrance. Such inquiry would have brought into view the acknowledgment or receipt by Benson, made in writing at the time the note and mortgage were executed, to the effect that they held this note as collateral security for any indebtedness then existing, or which might thereafter accrue to F. H. Benson, or F. H. Benson & Co., by Goodman and Mason, whether the same should be by bill, note, check or account, or any other manner whatever, and upon the same being paid they would surrender the note.

This case of *Craig* v. *Tappin*, holds, that a mortgage intended to secure future advances, need not express that object in

the mortgage itself; it would be better to do it, but its omission will not render the security invalid. So this court held, in the case of *Collins et al.* v. *Carlile*, 13 Ill. 254, on a review of most of the authorities, that a mortgage taken to secure future advances is valid, although it does not show upon its face the real character of the transaction. But in such a case, the mortgagee can only recover the amount actually due at the date of the sale of the equity of redemption.

But it is further objected by appellants, that this doctrine obtains only in regard to mortgages of real estate, and is not applicable to chattel mortgages.

There is nothing in our chattel mortgage act inhibiting mortgages to secure future advances, and there is nothing in principle, that we can discover, to forbid it. All that is requisite is, that the transaction should be *bona fide*.

The case referred to in *Lawrence* v. *Tucker*, 23 How. (U. S.), 14, was a case of a chattel mortgage on the furniture of the "Briggs House," in Chicago, and was for future advances; and was upheld by the Supreme Court of the United States. It is true, the question was not started in that case, possibly for the reason given by the appellants here, that the eminent jurist, Judge CURTIS, who argued for the appellant, and whose duty it was to know the whole law of the case, was ignorant of such a statute. The more probable reason would seem to be, that no difference was perceived, in principle, on what the mortgage should be based. It was impossible that the court and counsel did not know it was a chattel mortgage they were considering, and equally impossible, the objection should not have been made, if considered a sound one.

We do not perceive the difficulties to which appellants have alluded. The chattel mortgage and note would disclose the extent of the claim to be secured by it, the time in which it should be paid, and the time the mortgagor shall retain possession. If the mortgage stipulates that the property shall remain with the mortgagor two years, as it may stipulate, and if made *bona fide*, it is good and valid for that space of time from the day it is recorded. No subsequent purchaser or incumbrancer

could be deceived, or entrapped, or his rights injuriously affected. All the objections made by appellants on this point are answered by the cases to which reference has been made.

In the case of *Wescott* v. *Gunn et al.*, 4 Duer (N. Y.), 107, to the objection made, that the mortgage there under consideration was a chattel mortgage, the court said the authorities were not all agreed on the point whether such a mortgage could be given for future advances, without it is so expressed in the deed, on the strength of a mere parol agreement.

Whilst in *Walker* v. *Snediker*, 1 Hoff. Ch. 145; *Divers* v. *McLaughlin*, 2 Wend. 596, and *James* v. *Morey*, 2 Cow. 293, this was controverted; yet in *Craig* v. *Tappin*, 2 Sandf. Ch. 78, on which we have commented, and *Bank of Utica* v. *Finch*, 3 Barb. Ch. 293, the doctrine was conceded.

If this transaction had assumed the form of a pledge, and this property had been actually delivered into the possession of the mortgagee, to secure the debt already due, as well as future advances, to the amount of ten thousand dollars, and was to operate as a security for balances, could any person have doubted the validity of the transaction, if otherwise free from fraud? Now, our statute has authorized the execution of chattel mortgages, providing for the retention of the property by the mortgagor, when acknowledged and recorded in the mode prescribed, and, if *bona fide*, they are declared to be valid and binding. These statutory mortgages were, evidently, designed to take the place of, and are substituted for, a pledge to secure the payment of money, and the acknowledgment and the record of the mortgage is designed to afford the same notice to subsequent creditors and purchasers as is afforded by the possession under the pledge. Such being the purpose of the statute, no difference can exist between a chattel mortgage and a pledge accompanied with possession.

Another objection made by appellants is, that in the decree in the injunction case against Benson, Beveridge and the others, the expenses and counsel fees of Beveridge, not contemplated or referred to in the mortgage or in Benson's receipt, could not be inserted into the mortgage, and by

embodying such a claim in the decree, it rendered the whole decree invalid so far as Speer is concerned.

This proceeding was not to foreclose the mortgage by Benson, but was set on foot by the mortgagors and their assignees to restrain Benson from proceeding on the mortgage. In the settlement of the case, the details of the decree were left, as they usually are in such cases, to the parties and their counsel. The solicitor of the complainants in the case testifies that the sole object of the bill was to ascertain the amount due, and he stipulated that Haddock, who had filed his bill of interpleader, might have the decree and sale he had prayed for to include the sum of three hundred dollars to pay Beveridge and Moss, the assignees of Benson. The solicitor states, when the stipulation was made, he considered that it subserved the end sought by his clients, and so informed them; that it was made in good faith, and there was no fraud in the matter. Benson testifies, that the suit was compromised; the settlement was made in good faith; there was a balance due Goodman and Mason, on the 8th of October, 1857, of two thousand one hundred and seventy-four $\frac{48}{100}$ dollars, on which interest was computed to March 7, 1860, making the amount due at that time two thousand six hundred and eight dollars. There was the ten thousand dollar note which was given to secure any obligation, and there were three notes outstanding, one for two thousand dollars and two for fifteen hundred dollars each. Benson procured these two last notes, and on the settlement they amounted to about thirty-three hundred dollars. These notes were given up to the complainant, Gates, or to his solicitor, and the amount was settled by canceling the balance due Goodman and Mason and the payment of some four hundred dollars in cash by Gates or by his attorney. Haddock also gave his note to Benson for three hundred dollars, payable in three months, leaving one note of two thousand dollars still to be paid by the mortgage; that note was held by Haddock, and he gave the three hundred dollar note with the understanding that this two thousand dollar note, with the three hundred dollar note, was to be paid by

the mortgage. There was an assignment made at the time, of all the Benson interest in the mortgage, to Haddock, by consent of all parties. This three hundred dollar note was for part of the amount due by the fifteen hundred dollar notes, and they, with the two thousand dollar note held by Haddock, were secured by this mortgage which covered the personal property in the hotel. After this adjustment was had, the words "without recourse on me," over Benson's name, were put on the note. The proceedings have every appearance of fairness, and one circumstance strengthens it, and that is, that Gates, one of the complainants, paid four hundred dollars which it is not probable he would have done had it not been due, and the parties were then adjusting and settling their respective liabilities. There does not seem to be any fraud or collusion about these proceedings or decree. Both are denied by the principal actors in them, and no sufficient proof is adduced by appellants to establish the one or the other.

Another point made by appellants is, that both the sales, the one under this decree by the receiver, Kimball, and the other by Haddock himself under his mortgage, bear strong marks of fraud. These grounds are, that the auctioneer was employed by Haddock. To this there can be no objection, as Haddock had the right to have the property sold to satisfy his decree and his mortgage, and to employ the necessary agent for such purpose, and so long as the agent violated no law in making the sale, it cannot be attacked. The auctioneer swears that the sale was made as he had made them for a number of years. That when he commenced the sale, at his own instance, he offered the entire contents of a room. Haddock wanted the sale made for the best advantage. Speer objected; stated it was not best, and it was done otherwise; he had been an auctioneer twenty odd years, and the sale was so conducted as to bring the most money; that the usual way of selling chamber furniture is in sets, but, Speer objecting, it was done otherwise. The circumstances are not at all like those in the case of *Crary* v. *Sprague et al.*, 12 Wend. 41, cited by appellants. There the sale was brought about by the defendant in

concert with others, with the avowed object of defeating the interest of a third person in such property. Here the sale was managed by the party entitled to its proceeds, and the interest of Speer was all along regarded, and his wishes obeyed by the auctioneer, and he was himself a bidder at one of the sales.

Another question made is, that the testimony of Isaac Speer and Joseph L. Smith was rejected. This testimony was offered in the form of depositions, to which objections were made before the hearing, on the ground of interest. On this point the record recites: "It being admitted that the defendants claim the property as belonging to Isaac Speer, he having made an assignment for the benefit of creditors, and that Smith had signed the replevin bond as surety, the court sustained the objection, and excluded the depositions, to which ruling of the court the defendant then and there excepted. Isaac Speer had a direct interest in establishing the title to this property in the appellants, for thereby he relieved the sureties in the replevin bond, and created a fund out of which his liabilities could be paid, and Smith was interested as surety in the replevin bond.

The important point made in the case remains to be considered, it is this: That the property distrained for rent having been replevied by Gates, the lien of the distrainor was lost, and he was remitted to the replevin bond.

This is an interesting question, and we have looked into all the authorities cited on both sides.

As early as 1785, the High Court of Chancery of England, Lord THURLOW being Lord Chancellor, in the case of *Bradyll ex'r* v. *Ball et al.*, reported in Brown's Ch. 427, it was decided, after elaborate argument by KENYON, afterwards Lord Chief Justice of the King's Bench, in opposition, that goods taken in distress for rent and replevied, the distrainor has no lien on them, but is left to his remedy on the replevin bond.

This was a suit in chancery to enforce an alleged equitable lien by the landlord, upon the goods taken in distress, for a return of the goods or payment of the value of them.

KENYON contended that the landlord had a right to follow the goods,—that by the distress he had obtained a lien upon them, and that it was a clear rule in equity, that when a lien is once obtained, it will continue against the party and all volunteers claiming under him.

It was argued on the other side, that if the sheriff upon the *retorno habendo* returns *elongata*, the party has his remedy, first, against the sureties, and secondly, by *capias in withernam*, against the general goods of the tenant, but if the distrainee had no goods, or the distrainor did not choose this remedy, he had a *scire facias* against the pledgor, and if the sheriff made his return of *scire feci*, the landlord had his action for the value of the goods. If the pledgor had no goods, the landlord had his action against the sheriff himself, for taking insufficient pledges, but if the goods were eloigned, and became the property of another person, he could not follow them.

After the argument, which was conducted at great length, Lord Commissioner ASHHURST ordered the case to be spoken to again, when the court was full, and particularly to the point, whether, after the *retorno habendo*, and the goods returned, they could be sold under the statute, remarking, that at the common law the sheriff could only keep, not sell them; that a distrainor has no property in the goods,—they are only in the custody of the law for his security.

These points were argued by KENYON on one side, and Mr. MADOCKS and Mr. ARDEN, afterwards master of the rolls, on the other; the latter contending that the plaintiff's lien only continued until the goods were delivered by the replevin, and the statute only giving a sale if the goods are not replevied; the sheriff cannot sell in any other case; that upon *elongata* returned, the statute gave a remedy against the other effects of the tenant, and that, notwithstanding the acts were remedial, and favorable to the landlord, they did not vary the nature of his property; that being no contract in this case, there could be no equitable lien arising from contract; and the legal lien being gone by the replevin, the plaintiff had no lien on the goods, but must seek the other remedies.

Lord LOUGHBOROUGH, one of the lords commissioner, after remarking, when goods are replevied they are delivered over to abide the event of the suit, and if they come afterwards into the hands of persons in privity with the tenant, they would be liable on the return, and if sold, an action would lie for money had and received. If this were not the case, he said the law would be very defective, but the persons who had received money for them would certainly be liable in an action for money had and received.

The bill was ordered to be retained in order that an action might be brought for money had and received to the plaintiff's use, against the assignees, they to admit that they sold the goods taken in distress, to an amount exceeding the rent.

This action was brought in the Court of King's Bench before Lord MANSFIELD, and he, with Mr. Justice WILLES and Mr. Justice BULLER, threw out an opinion against the right of the plaintiff to recover, but on a technical ground the plaintiff was nonsuited. In a subsequent action tried in the same court, a verdict was found for the plaintiff subject to a case reserved for the opinion of the court. That case was argued, and the Court of King's Bench were unanimously of opinion that the plaintiff had no lien upon the goods, and ordered another nonsuit.

The cause came on in chancery, on the equity reserved, which resulted in a dismissal of the bill for want of equity.

This case has been cited by all text writers on the subject, with approbation, and by the courts whenever the question has come up for adjudication. *Sweet et al.* v. *Pyrn*, 1 East, 18; *McCombie* v. *Davis*, 7 id. 5; Cross on the Law of Lien, 346; Whittaker on Lien, 68.

In *Woglam* v. *Cowperthwaite*, 2 Dallas, 68, the same doctrine was held, and the question considered settled, by the case of *Bradyll* v. *Ball*. The court, by SHIFFEN, President, further say, by the replevin, the securities in the bond are substituted in the place of the goods which are restored to the tenant as his sole property; he may sell them; they may be taken in

execution, and they become liable to any future lien or incumbrance. Upon the *retorno habendo*, if the identical goods distrained are in the hands of the tenant undisposed of, and unincumbered, they may be taken by the sheriff; if not, after an *elongata* returned, a *withernam* may go against the general goods of the tenant. It was so decided also in *Frey* v. *Leaper*, id. 131.

If this be so, in regard to the goods of a tenant which may be considered as held by him subject to the rent, how much stronger is the case in favor of a third party who claims the general property in the goods, as in this case, and gives pledges to make his claim good. And where is the hardship or injury to the landlord, since, all he can get in any event, is the amount of his rent, and it is quite immaterial, whether that amount is made out of the sale of the goods distrained or by action against the obligors in the bond. If the sureties are not sufficient, or were not, when taken by the sheriff, the sheriff would be liable on his official bond, so that it is next to impossible, the distrainor could be injured. It cannot be maintained that appellants by their distress warrants acquired any property in these goods. The most they acquired was a lien, the general property remaining in the distrainee, and while in him, he transferred it by mortgage, before the replevin suit was determined. This, if in fraud of his landlord, was valid between the parties to it, and could only be set aside by a creditor on the allegation and proof of the fraud. A *bona fide* purchaser will always hold the property against creditors, if he is no party to the fraud. The suit in replevin between appellant and Goodman and Mason, settled none of the rights of appellee, or Haddock under whom he claimed, as neither of them was a party to that suit or privy. When appellant levied the distress warrants, he had notice that Benson was in possession, or attempting to take possession under his mortgage, as he signed the injunction bond for Goodman and Mason. The appellants, in answer to these cases cited, have referred to a large number of cases, which may militate somewhat against the doctrine they establish, but in none of them, is any refer-

ence made to these cases. It is only by inference, that they are supposed to be in hostility.

There is no such difference in the statutes of England and of Pennsylvania, on the subject of replevin, and our statute, as to originate a different doctrine. The principle is, that when the distrained property leaves the possession of the distrainor, he loses his lien.

The case of *Grimsley et al.* v. *Klein,* 1 Scam. 343, is relied on by appellants, as a case in support of the views they have so ably pressed on the notice of the court. In that case, the point, among others, was made, that the claimant of the property was not the absolute owner of the goods levied on by virtue of the execution, but was only interested in them as a landlord who had distrained upon the goods for rent, and a motion, for this reason, was made to dismiss the cause for want of jurisdiction. This motion was overruled and an exception taken. The court say: During the progress of the trial in the court below, several exceptions were taken to the opinion of the court, which are also assigned for error here. None of the exceptions, however, are considered well taken, except that which relates to the reading in evidence of a paper purporting to be a lease from Klein, the appellee, to one Bailey.

It is by inference only, that the court can be said to have decided that a distrainor·had such an interest in the property levied on by execution, against his tenant, as to permit him to claim it before the sheriff. In this view we entirely concur. The landlord had not lost his interest or lien, by losing the possession after he had taken it, and receiving in lieu thereof, a bond for the return of the property. He stood in a position where he could rightfully appear as a claimant, he never having lost his lien, and that lien, it must be presumed, was prior in time to that of the plaintiff in the execution. We must conclude, on the authorities we have cited, that the law is, that property distrained for rent, having been replevied by a party. claiming to be the general owner, the lien of the distrainor is lost, and he has no remedy but on the replevin bond. In *Gorton* v. *Brown,* 27 Ill. 495, this court held an action on the case

for maliciously suing out an injunction could not be maintained, the only remedy being on the injunction bond.

Another, and the only remaining question raised by appellants, not made in their brief, is this, that the replevin bond, being made in this case to the coroner, and not to the sheriff, is void on its face.

The replevin act, by the fourth section, provides that before the execution of any writ of replevin, the party suing out such writ, shall give bond to the sheriff, &c.

Section 18 of act respecting sheriffs and coroners, provides, in case of a vacancy in the office of sheriff, by death, resignation, removal or otherwise, the coroner shall do and perform all the duties pertaining to the office of sheriff, receive the proper fees and emoluments, and be liable to the same penalties and proceedings as if he were sheriff, until such vacancy be filled, &c., and it is made the duty of all coroners to execute all process within their respective counties, in all cases where just exception can be taken to the sheriff or his deputy or deputies, or where there is no sheriff; and in all cases, upon affidavit made and filed with the clerk of any court of record in this State, of the partiality, prejudice, consanguinity or interest of the sheriff or of the deputy sheriff of any county where suit is about to be brought, or shall have been commenced, it is made the duty of the clerk to issue and direct original or other process in the suit, to the coroner, who is required to execute the same, and attend to the suit throughout, in the same manner as the sheriff would or ought to have done.

The answer to the objection then is, that the court must presume one of the contingencies had happened which made it necessary to direct the writ of replevin to the coroner, and as the objection is now made here for the first time, this court will so presume. Had the objection been made below, the party might have shown that at the time the writ was issued, the sheriff was dead, resigned or removed, or that an affidavit was filed of his interest, consanguinity or prejudice, or that other just exception was taken to the action of the sheriff in that particular case.

The writ of replevin being issued to the coroner, it follows as a matter of course, that he had power to take all legal steps towards its execution, which included the taking of a bond to himself, as coroner. The statute naming the sheriff as the party to whom the bond is to be given, means only that the bond shall be given to the officer serving the writ.

Not perceiving any error in the record, the decree must be affirmed.

*Decree affirmed.*