(73 N. W. Rep. 87.)

---

UNION NATIONAL BANK OF OSHKOSH *vs.* MOLINE, MILBURN & STODDARD COMPANY, *et al.*

Opinion filed December 10th, 1897.

**Mortgage for Future Advances Valid.**

> A mortgage to secure future advances is valid as to the mortgagor, and also as to third persons.

**Second Mortgagee with Notice, Subject to First Mortgage.**

> If such mortgage states on its face that it is given as security for future advances, or if it appears to be a mortgage for a specified sum, and the total amount claimed to be due under it does not exceed such sum, the holder of a second lien on the same property, who has notice, either actual or constructive,

of such mortgage, takes subject thereto, not only as to all advances which had been made when his lien attached, but also as to all future advances made by the holder of such mortgage before notice that another lien has attached to the property.

### Record of Second Lien Not Notice to Prior Incumbrancer.

The recording of the second lien does not give the holder of the prior mortgage constructive notice of such second lien, and therefore advances thereafter made are protected the same as advances made before such second lien is recorded, provided the holder of the first lien has no other notice of the existence of such subsequent lien.

### Marshalling Securities—Subrogation.

Where a person holds a first lien on property on which another holds a second lien, and he also has a lien upon other property, on which there is no other lien, it becomes his duty, as soon as he learns of the second lien, to respect the rights of the holder of such second lien to have the property on which he (the second lien holder) has no lien first applied in extinguishment of the first lien. The law will thwart every attempt of the holder of the first lien to escape the obligation of this equitable duty. If he releases the property on which he alone holds a lien, such lien will, to the extent of the value of such property, be postponed to the second lien on the other property. If he attempts to enforce his lien as to the property on which the other party holds a lien, a court of equity will, except under special circumstances, restrain him until he has exhausted his remedy against the other property. If he does, in fact, first enforce his lien against the property covered by the second lien, the holder thereof will, to the extent that he is prejudiced thereby, be subrogated to the rights of the other party under his first lien upon the other property.

### Advances Made After Notice of Second Lien.

One who holds a first mortgage to secure future advances on two pieces of land, on one of which there is a second incumbrance, of which he has notice, cannot, after such notice, advance more money to the mortgagor, and then claim the right, as against the holder of the other incumbrance, on the foreclosure of the mortgage against the parcel on which he alone holds a lien, to apply the proceeds of such foreclosure, either in whole or in part, upon such subsequent advances, but he must first apply them upon the debt due him at the time he learned of the existence of the second mortgage upon the other property.

### Action by Second Mortgagee—Burden of Proof—Damages.

One who holds a chattel and also a real estate mortgage to secure a claim (such mortgages being first liens on such property,) and who takes possession of the personal property for the purposes of foreclosure (the same being in the possession of the sheriff under attachment thereof, creating an inferior lien thereon,) is bound to respect the rights of the holder of such attachment lien of which he has notice, and therefore must proceed with reasonable diligence to foreclose his mortgage. If he merely holds the property, without taking any steps to foreclose his mortgage for an unreasonable time (in this case, for the period of six

years,) and in the meantime such property becomes lost to the holders of both liens, he is liable in an action on the case for the value thereof, less the amount of his prior lien thereon; the theory of such liability being that he has by his negligence damaged the holder of the second lien. But in such a case the holder of the second lien cannot recover if he holds a lien on other property of sufficient value to pay the same. When it appears that he has other security, he must prove the value thereof, to establish his damages, as the burden is upon him, and the law will not presume that the other security is inadequate at all. Certainly there is no presumption with respect to the extent of such inadequacy.

### Negligent Loss of Property Subject to Lien.

But in such a case the holder of the first lien loses, by such negligent conduct, his first lien on the real estate, on which also such attachment was a second lien, to the extent of the value of the property so negligently allowed by him to be lost to himself and the holder of the other lien.

### Claim and Delivery—Sale of Property Pendente Lite.

While it may be true that the party to a replevin action, who is in possession *pendente lite* because he has given security, cannot sell the property so as to affect the title of the other party to the action, yet, if such other party is claiming only a lien on the property, and is seeking to recover or regain possession only for the purpose of enforcing such lien, the party in possession may sell such property if he is owner, or may sell it under foreclosure of any lien he may have thereon, and the purchaser will obtain a title free from the lien of the party not in possession, without reference to the question of priority of liens between him and the one who is so enforcing his lien. In such a case the bond takes the place of the property, unless, after final judgment, it can be found in the possession of the other party, it not having in the meantime been disposed of or incumbered by him.

Appeal from District Court, Ransom County; *Lauder*, J.

Action by the Union National Bank of Oshkosh against the Moline, Milburn & Stoddard Company, James Morrison, Harriet J. Morrison, and others to foreclose a mortgage, and establish the same as a first lien upon the property mortgaged. From a decree awarding priority to plaintiff, the Moline, Milburne & Stoddard Company appeal.

Reversed.

*George D. Emery* and *L. A. Reed*, for appellant.

Respondent held personal property taken by it in claim and delivery from 1888 until 1894, claiming that the property could not be sold under its mortgage while the suit was pending. When

it took possession to satisfy its lien, it assumed the implied obligation to proceed without unreasonable delay and with due regard for the rights of the mortgagor. *Murray* v. *Loushman*, 66 N. W. Rep. 413. The mortgagee is bound to account for any surplus left after satisfying his lien and if he keeps the property and fails to sell it in the manner provided by law, he becomes liable for its market value at the time of the taking. *Denny* v. *Faulkner*, 22 Kan. 83; *Miller* v. *McElwain*, 52 Kan. 94; *First Nat. Bank* v. *Wilbur*, 26 Pac. Rep. 777; *Stewart* v. *Long*, 44 N. E. Rep. 63; *Craig* v. *Tappin*, 2 Sandf. Ch. 78. When a creditor has security upon two pieces of property, upon one of which only another has security. The creditor having two securities must first resort to and exhaust that security upon which the other creditor has no lien. And where such creditor takes possession of personal property upon which he has one of the securities and neglects to foreclose his mortgage, the value of the chattels at the time of taking will be applied upon his debt. 2 Jones on Morts. 1628–9, 1630; Jones on Chat. Morts. 773–774; *Moody* v. *Haseldon*, 1 S. C. (N. S.) 129, *Straub* v. *Screven*, 19 S. C. 445; *Wygal* v. *Bigelow*, 42 Kan. 477; *In re Haake*, 2 Sawy. 231; *Stoddard* v. *Denniston*, 7 Abb. Pr. N. S. 309; *Craig* v. *Tappin*, 2 Sandf. Ch. 85; *Olcott* v. *Tioga*, 40 Barb. 179; *Drayton* v. *Chandler*, 53 N. W. Rep. 558; *Des Moines* v. *Harding*, 53 N. W. Rep. 99; *Linninger* v. *Herror*, 36 N. W. Rep. 481; *Rockford* v. *Mainfold*, 55 N. W. Rep. 236; *Everett* v. *Buchanan*, 6 N. W. Rep. 439; 2 Dak. 249, 8 N. W. Rep. 31; *Brong* v. *Brown*, 3 N. W. Rep. 291; *Lee* v. *Fox*, 14 N. E. Rep. 889.

*Ball, Watson & Maclay*, for respondent.

The machine company never brought itself within § 5051, Rev. Codes. It never required the bank to first exhaust the personalty before resorting to the real estate. *Richards* v. *Spicer*, 23 Minn. 212. Independently of statute it was bound to notify the bank to first exhaust the personal property security. *Ross* v. *Duggan*, 9 Colo. 85; Harnings Appeal, 90 Pa. St. 388. While appellant was contesting with the bank for a paramount lien upon the personal

property, the bank was not required to sell this property.   *Evertson* v. *Booth*, 19 Johns. 486.   The equitable rule as to marshalling does not apply where the validity of the attachment lien depends upon the invalidity of a transfer of the property attached.   *Schaff* v. *Meyer*, 34 S. W. Rep. 858; *Coburn* v. *Stephens*, 36 N. E. Rep. 132.

CORLISS, C. J.   In this action, instituted to foreclose a mortgage, a contest for priority of lien has arisen between the plaintiff and the defendant the Milburn & Stoddard Company.   The mortgage was executed by James Morrison, the owner of the land.   It was delivered November 26, 1887.   Morrison was at that time indebted to the plaintiff on several notes, and was also liable to it as indorser upon the notes of others.   Simultaneously with the execution of this mortgage, he borrowed from the plaintiff $4,000.   The mortgage was given to secure his indebtedness to the plaintiff, and his contingent liability on the notes referred to, and also as security for future advances.   At the same time Morrison executed and delivered to plaintiff as further security a chattel mortgage on a large amount of personal property situated at that time in this state, the property being located on the farm covered by the real estate mortgage, and being stock and farming implements and machinery used by Morrison in the operation of such farm.   A few days after the delivery of these two mortgages, the defendant Milburn & Stoddard Company attached the land and chattels in an action against Morrison as guarantor on a bond signed by him guarantying the fidelity of Hughes & McDonald as agents of the defendant Milburn & Stoddard Company.   On the 27th of February, 1891, judgment was rendered in that action in favor of Milburn & Stoddard Company and against Morrison for $17,-658.18.   While the sheriff was holding the chattel property under the attachment, it was taken from him by the coroner in claim and delivery proceedings in an action of replevin instituted by plaintiff, the mortgagee in the chattel mortgage thereon, plaintiff claiming priority of lien over the attachment.   The defendant in that action, the sheriff, having failed to rebond, the coroner

delivered the property to the plaintiff, and such property remained in the possession of the plaintiff during the pendency of the replevin action, or rather until it was lost to the plaintiff, and to the defendant as well, part of it being sold by Morrison, who had the custody thereof as agent for the plaintiff, part of it being destroyed by fire, and some of it (the live stock) dying of old age, or being killed by accident. For six years—*i. e.* from May 1888, when it was delivered to plaintiff in the claim and delivery proceedings, until July, 1894, when plaintiff attempted to foreclose its mortgage, and found only a trifling amount of property, from which it realized on foreclosure only $5.50—the plaintiff suffered the property covered by its mortgage to remain in the possession of its agent, James Morrison, who was the owner of such property; and during all this time it is apparent that plaintiff took no steps to protect its interests under such mortgage, but, on the contrary, permitted Morrison to deal with the property as owner, without any reference to the rights of the plaintiff as mortgagee. While the litigation involving the question of priority was pending, the plaintiff does not pretend that it ever looked after the property, or in any manner attempted to exercise any control over it as mortgagee in possession. While it is said that the possession of Morrison was that of a mere agent, the facts of the case indicate very strongly that plaintiff allowed such possession to become that of an owner. It would almost seem that the object of instituting the replevin action was to secure possession of the property for the purpose of helping Morrison in his financial trouble, and that the purpose from the beginning was to hand the property right over to him as mortgagor and owner. But we shall adopt the theory of the learned trial judge that the litigation was an honest one on the part of the plaintiff, the sole object of the plaintiff being to settle the question of priority between these two liens. After a protracted contest in the courts of this state (the law of the case being declared by this court in *Bank* v. *Oium*, 3 N. D. 193, 54 N. W. Rep. 1034,) the plaintiff was successful in its claim of priority,

and secured judgment confirming its right to the possession of the property already in its possession under the claim and delivery proceedings before referred to.   Without further discussing at this time this phase of the case, we now turn to another complication.

The mortgage on the real estate, given by Morrison to the plaintiff, was a mortgage to secure future advances.   On its face it secured $20,000, according to a bond executed at the same time.   And the bond discloses the fact that one of the objects of the transaction was to protect the plaintiff by this lien not only as to present indebtedness, but also with respect to the future liability of Morrison to it.   At the time the defendant's attachment became a lien on the real estate, there was due on the plaintiff's mortgage a certain sum.   Subsequently a portion of this was paid.   The amount of that indebtedness still unpaid is $7,000, with interest thereon from December 31, 1890.   Taking up our position at this period of time to ascertain the relative rights of the parties, we find that plaintiff then held a first lien on the real estate for $7,000 and interest, and the defendant a second lien thereon, which would be defeated by its failure to recover judgment on its claim against Morrison, but which would become a fixed second lien as of the date of such attachment if it succeeded in establishing in court the justice of its claim.   Were it not the fact that plaintiff's mortgage secured future advances as well as present indebtedness, we would have no further trouble with this branch of the case.   But it appears that the plaintiff, relying on its lien for future advances, loaned Morrison the further sums of $1,000 on November 17, 1891, and $1,600 on January 5, 1891.   A portion of the $1,000 note has been paid, but there is still due on these two notes a large amount of principal and interest, and the question is whether, as to this amount also, the plaintiff's mortgage is a first lien on the real estate.   That a mortgage to secure future advances is lawful as between the parties, and also with respect to third persons who deal with the land or secure liens thereon, has become an elementary principle.   3 Pom. Eq. Jur. § §

1197, 1198, and cases cited. See also, the decisions subsequently cited in the opinion on this branch of the case. To the extent that advances are made under it before another lien attaches to the property, all the adjudications agree that it is a prior lien thereon. The only difficulty arises when, intermediate the execution and recording of the instrument and the making of some of the future advances, other liens are affixed to the land. In such a case, shall the mortgage be a first lien as to all advances, or only as to those made before the second incumbrance has fastened itself upon the property? When we turn to the voice of authority to settle this question, we hear not a single clear utterance, but a veritable Babel of tongues. Originally, it was the rule in England that, without reference to the question whether the mortgagee was obligated by contract to make future advances, all advances secured by the mortgage, no matter when made, or whether the mortgagee then knew of the inferior lien, were a first lien on the property. *Gordon* v. *Graham*, 7 Vin. Abr. 52 pl. 3, 2 Eq. Cas. Abr. 598. But in *Hopkinson* v. *Rolt*, when this case was before the house of lords (9 H. L. Cas. 514,) Lord Campbell declared the rule laid down by Lord Cowper in *Gordon* v. *Graham*, to be unsound, and the doctrine was there enunciated that the mortgagee who advances money under his security, with knowledge of a subsequent incumbrance, must, as to such advances, be content with a lien inferior to that of the holder of such later incumbrance. In this country there has been some leaning towards the early English rule. See *Witczinski* v. *Everman*, 51 Miss. 841; 1 Jones, Mortg. § 373; 3 Pom. Eq. Jur. § 1199; *Rowan* v. *Manufacturing Co.*, 29 Conn. 282; *Brinkmeyer* v. *Helbling*, 57 Ind. 435; *Brinkmeyer* v. *Browneller*, 55 Ind. 487; *Wilson* v. *Russell*, 13 Md. 495, But the stronger array of authority is found on the side of the doctrine established by the house of lords in the Hopkinson case. See *Frye* v. *Bank*, 11 Ill. 381; 1 Jones, Mortg. § § 368, 369; 3 Pom. Eq. Jur. § 1199, and cases in note 1, p. 180. This doctrine is recognized by many of the decisions to be hereafter cited. All the adjudications appear to agree that, in

the absence of notice of the inferior lien, the holder of the security for future advances may continue to treat the property as free from subsequent incumbrance, and therefore can safely make further loans to the debtor. His prior equity under the mortgage is superior to the subsequent equity of the one who holds the latter lien as to all advances made in ignorance of such subsequent incumbrance, whether made before or after it attaches to the property. *Truscott* v. *King,* 6 Barb. 346; *Shirras* v. *Caig,* 7 Cranch, 34; *Ackerman* v. *Hunsicker,* 85 N. Y. 43; *Reynolds* v. *Webster,* (Sup.) 24 N. Y. Supp. 1133; *Planing Mill Co.* v. *Schuda,* (Wis.) 39 N. W. Rep. 558; *Tapia* v. *Demartini,* (Cal.) 19 Pac. 641; *Ward* v. *Cooke,* 17 N. J. Eq. 93; 1 Jones, Mortg. § 368; *Central Trust Co.* v. *Continental Iron Works,* 51 N. J. Eq. 605, 28 Atl. 595; 3 Pom. Eq. Jur. § 1198; *Lanahan* v. *Lawton,* (N. J. Ch.) 23 Atl. 476. Some cases go further, and hold, as we have already shown, that even notice of the inferior lien will not suffice to debar the mortgagee of a right to priority as to advances made subsequent to such notice. On the other hand, there are decisions which hold that the recording of the instrument creating the latter lien, or the docketing of a subsequent judgment, constitutes constructive notice to the prior mortgagee, so that all advances thereafter made by him are deemed to have been made with knowledge of the existence of the inferior lien, and that, therefore, they become liens as against such inferior lien only from the time such advances are made. *Ladue* v. *Railroad Co.,* 13 Mich. 380; *Savings Inst.* v. *Thomas,* 29 Grat. 483; Bank of Montgomery Co's Appeal, 36 Pa. St. 170; *Ter-Hoven* v. *Kerns,* 2 Pa. St. 96; *Spader* v. *Lawler,* 17 Ohio, 371; *Boswell* v. *Goodwin,* 31 Conn. 74. See, also, note to *Boswell* v. *Goodwin,* 3 Am. Law Reg. (N. S.) 92; 1 Washb. Real Prop. 542. While there is much force in the arguments adduced in the support of this doctrine, we regard the opposite rule as more consistent with principle, and more just in character, and better calculated to subserve business convenience; and at the present time it is certainly upheld by a greater number of

decisions. Moreover, all text writers appear to favor it; and some of them go further (as, indeed, some of the courts do,) and insist that actual notice of the subsequent incumbrance ought not to affect the priority of lien of the first mortgage, even as to advances thereafter made. We cite some of the cases which enunciate the rule that the holder of the inferior lien must bring home knowledge thereof to the owner of the first mortgage if he would defeat his right to claim priority as to advances made after the latter lien has attached, and that the recording of the subsequent lien will not constitute constructive notice. *Ackerman v. Hunsicker,* 85 N. Y. 43; *Truscott v. King,* 6 Barb. 346; *M'Daniels v. Colvin,* 16 Vt. 300; *Reynolds v. Webster,* (Sup.) 24 N. Y. Supp. 1133; *Central Trust Co. v. Continental Iron Works,* 51 N. J. Eq. 605, 28 Atl. 595; *Ward v. Cooke,* 17 N. J. Eq. 93; *Tapia v. Demartini,* (Cal.) 19 Pac. Rep. 641; 3 Pom. Eq. Jur. § 1199; 1 Jones, Mortg. § 372; *Nelson's Heirs v. Boyce,* 7 J. J. Marsh. 401. See 11 Am. Law Reg. (N. S.) 273. Of course, the holder of a second lien must have notice of the prior mortgage. The registration thereof constitutes such notice. But it is not enough that there is another mortgage on record when his second lien attaches. It is necessary that that instrument should inform him on its face that it is given to secure future advances, or it must state an amount for which it is security, and the sum as to which priority is claimed must not exceed this amount. If, with a mortgage on record, which on its face asserts that it is intended to secure contemplated advances, another person obtains a lien on the property, he should see to it how much in fact has been loaned at that time; and, if he desires to prevent the increase of the prior lien, he must notify the holder thereof that another lien has attached to the property. If the mortgage is for a specified sum, the one who obtains a subsequent lien is informed by the record that there may be this sum due on the prior lien, and, if no greater amount is allowed by the law to become a prior lien, he has not been prejudiced in the least. In the case at bar, the mortgage, while not stating that it was for future advances, appeared to be

a first lien for $20,000, ahead of defendant's attachment.    Defendant would actually be in better shape than it had any right to hope to be in view of what appeared to be due on the mortgage, if we should hold that the plainntiff's lien was prior as to all debts of Morrison to plaintiff, whether contracted before or after the second lien attached.    The mortgage informed defendant that there was $20,000 due thereon, while the utmost that plaintiff claims upon its mortgage is about $12,000.    Our decision is that the mortgage is, so far as this point is concerned, a superior lien as to the whole amount due thereon, unless the plaintiff had actual notice of the existence of defendant's lien by attachment before the loans of $1,000 on November 17, 1890, and $1,600 on January 5, 1891, and before certain other still later advances, which it is not necessary here to mention in detail, were made.

Plaintiff's cashier, who was a witness on the trial of this case, testified as follows:    "I remember hearing about the claim of a lien on the real estate and personal property described in the two mortgages taken November 26, 1887, by the Moline, Milburn & Stoddard Company, but I have no remembrance about the date. I have known for a long time such a claim was made.    At the time of the taking of my deposition in June or July, 1888, taken before Harshaw, I understood that the Moline, Milburn & Stoddard Company claimed a lien."    That his knowledge was the knowledge of the bank does not admit of doubt.    We therefore find that plaintiff, before making these later advances, knew of the lien on the land which the defendant had obtained by attachment. As the plaintiff, when it made the subsequent advances to Morrison, know that there was another lien on the property, it cannot, as to those advances, claim priority.

The case before us is not a case where the mortgagee who holds the security for future advances has obligated himself to make such advances.    It does not appear from the record that the bank bound itself to advance Morrison a dollar in the future.    If it had so agreed, and the moneys subsequently loaned him had been loaned in pursuance of such agreement, it is possible that

we might reach a different conclusion on the question of priority here discussed for the stronger array of authorities is found on the side of the doctrine that under such circumstances the mortgagee's rights, even as to subsequent advances, made with full notice of the second lien, are superior to those of the holder of such lien. *Rowan* v. *Manufacturing Co.*, 29 Conn. 282, 325; *Boswell* v. *Goodwin*, 31 Conn. 74; *Brinkmeyer* v. *Helbling*, 57 Ind. 435; *Brinkmeyer* v. *Browneller*, 55 Ind. 487; 1 Jones, Mortg. § 370, and cases cited; 15 Am. & Eng. Enc. Law, 799. It is urged that after the lien of the attachment was fastened upon the land the plaintiff loaned Morrison another $1,000, in March, 1888, and that as to this sum plaintiff cannot claim priority of lien. But it does not appear that at this time the plaintiff knew that defendant's lien had attached. It was, therefore, protected as to this subsequent loan. Moreover, it appears that Morrison paid this $1,000 and the interest thereon, and that, therefore, the amount due was not permanently increased by this temporary additional loan. Our conclusion on this branch of the case is that, but for other facts, to be now referred to, the plaintiff would be entitled to a first lien on the land as against the defendant for the sum of $7,000, with interest thereon from December 29, 1890.

Heretofore we have been discussing this case on the theory that the plaintiff held only this real estate mortgage. But it appears that it was otherwise secured. It held the chattel mortgage already mentioned, and, in addition, it had a mortgage on real property in Algoma, in the State of Wisconsin. For the sake of brevity, we will hereafter speak of this mortgage as the "Algoma mortgage," and will refer to the mortgage on the North Dakota land as the "Dakota mortgage." The Algoma mortgage also was given to secure future advances, and it was the only incumbrance on the land it covered. In view of the fact that both of these mortgages embraced all indebtedness of Morrison to the plaintiff, past, present, and future, it is evident that they secure the same claims. Therefore, at the time the defendant attached the Dakota land, the plaintiff held double security for the sum

then due on the Dakota mortgage, which is still due; *i. e.* $7,000, and interest. It had the Dakota mortgage and the Algoma mortgage. Before the debt of Morrison to the plaintiff had been increased, the plaintiff became cognizant of the existence of the defendant's lien. At the very moment plaintiff learned there was an inferior lien on one of the securities held by it,—*i. e.* the Dakota land,—it became its duty to treat its claim as a first lien on the Dakota land only to the extent of the balance due after exhausting its remedy against the Algoma property. There then sprang up in favor of the defendant an equitable right to insist that plaintiff should, in enforcing its liens, respect defendant's lien right's, and do nothing to the prejudice thereof. Had plaintiff released its security on the Algoma land, its lien on the Dakota land would have been postponed to that of the defendant to the extent of the value of such Algoma land. Had it essayed to foreclose the Dakota mortgage before exhausting its Algoma security, a court of equity (assuming such security to have been sufficient) would have restrained it until it had foreclosed the mortgage on the land on which the defendant had no incumbrance. If the defendant had not seen fit in the supposed case to invoke the aid of equity at this stage, or if equity would not have interposed because the Algoma land was not sufficient to pay the amount of plaintiff's prior lien, defendant would, after plaintiff had sold the Dakota land, and cut off its second lien thereon, have been subrogated to all the rights of the plaintiff as the holder of a first mortgage on the Algoma land to the extent necessary to indemnify it for plaintiff's disregard of its equitable rights. The great underlying principle in such cases is that, no matter what device or shift the holder of the first lien may resort to, every attempt to evade his duty to the owner of the inferior lien will be thwarted by the law. In equity he has a lien on the particular land covered by both incumbrances only as to the amount due after applying the value of the other security in extinguishment of his debt. He can bind the other party with respect to the value thereof by a public sale on foreclosure. But, if he sees

fit to release such land, he is then accountable for its actual value in the adjustment of the equities of the parties with regard to the other property on which they both have liens. The principle we here invoke is so elementary that citation of authority seems almost unnecessary. See 3 Pom. Eq. Jur. § 1414; *Gotzian & Co. v. Shakman*, 89 Wis. 52, 61 N. W. Rep. 304. See, also, § 4690 of the Rev. Codes.

But in the case at bar the plaintiff did not, by its mode of dealing with the Algoma land, invade the defendant's equitable rights. It did, in fact, exhaust that security before attempting to foreclose its mortgage on the Dakota real estate. It is only by its attitude on the question of the application of the proceeds of the sale of the Algoma land on foreclosure that it has taken a position prejudicial to the equities of the defendant. The net amount realized on such sale was $4,790.17. The qustion arises, how must this sum be applied? At the time it was received by plaintiff (April 6, 1894,) there was due on the $7,000 note the sum of $8,890, being the principal sum and interest thereon from December 29, 1890, to that date. This principal sum of $7,000 was, as we have already seen, due on plaintiff's mortgage at the time it learned of defendant's inferior lien. It follows that plaintiff has an undisputed right to apply the net proceeds of the Algoma foreclosure on the amount of this note, principal and interest. After making this application, we find that there was still due from Morrison on this note, on the 6th of April, 1894, the sum of $4,099.83. But it is contended by counsel for plaintiff that plaintiff was not bound to make such an application of the funds of that foreclosure. At the time thereof there was a much larger sum due on these two mortgages because of advances made by plaintiff to Morrison after it knew of defendant's lien; and it is urged that plaintiff could apply all of the moneys received from the sale of the Algoma land on such of the indebtedness as was not in existence when plaintiff learned of defendant's equitable rights as the holder of a second lien on the Dakota real estate; or, at least, that it had a right to apply a

proportionate amount on such indebtedness.   We must be careful not to confound this case with one involving a mere question of application of payments between a debtor and his creditor.   As Morrison does not appear to have directed how this money should be applied, it may be that the plaintiff can, as against him, apply it as it sees fit, although we are not prepared to hold that this is the rule when the money sought to be applied by the creditor is not paid to him by the debtor, but is received by him on sale of securities.   Be that, however, as it may, it is obvious that, when the rights of the holder of an inferior lien are involved, and the question is how moneys shall be applied as affecting only the relative priorities of liens, we must consider the obligation of the holder of the first lien at the time he learns of the existence of the inferior lien.   The obligation which then rests upon him he cannot escape by any conceivable device.   In equity he is bound to apply the value or the proceeds of the security on which the other party holds no lien to the extinguishment of the debt then due him, and he can look to the other security only for the balance.   It follows that, although his claim may be subsequently increased, and he may enforce it as against the property on which he alone holds a lien to the full amount of the value of such property, yet when he comes to apply the proceeds of the sale thereof he must apply them in accordance with the fixed obligation resting upon him to extinguish, so far as such proceeds will go, the debt he held at the time he discovered the fact that another lien had attached to the other property.   To allow him to apply them wholly or in part to the payment of the subsequent debt would be to permit him to accomplish by indirection that which he could not accomplish in any other way. In the case at bar the plaintiff, as soon as it learned of the defendant's subsequent lien on the Dakota land, became obligated (as much as if it had solemnly covenanted so to do) to first apply the value of the Algoma security in extinguishment of the then indebtedness of Morrison to it.   It cannot escape the force of this obligation by suffering Morrison to increase that indebted-

ness, and then applying the whole or a portion of the value of this security to the new debt, leaving all of the old debt to be made out of the Dakota land, or a greater portion thereof to be so made than would have fallen thereon had it respected its equitable obligation to the defendant. We are clear that all of the moneys received from the sale of the Algoma lands must be applied on the $7,000 and interest, and that plaintiff has a first lien on the Dakota land for only the balance; *i. e.* $4,099.83. Of course, it has a lien on the Dakota land for all its claims against Morrison; but such lien is subordinate to that of the defendant as to all except this sum of $4,099.83, with interest thereon from April 6, 1894. As to this amount, plaintiff's lien would be paramount, were it not for facts to be now considered.

We have already referred to the chattel mortgage held by plaintiff upon a large amount of property owned by Morrison, and situated on this Dakota farm, and to the fact that the property was taken by the plaintiff in an action of replevin against the sheriff, who was holding under defendant's attachment. Plaintiff was finally successful in that action. It established its right to priority of lien on these chattels as against defendant. When plaintiff seized this property, its attitude was that its lien was superior. But it did not dispute the fact that defendant held a lien thereon subordinate to its lien. It knew of such lien. In no event could it defeat defendant's rights thereunder. Moreover, the plaintiff knew that defendant had secured by attachment a second lien on the Dakota land, and it was therefore bound to do nothing with this chattel security inconsistent with defendant's right to insist that it should not suffer any property on which it had a lien to escape therefrom to the prejudice of the defendant, even on the assumption that defendant had obtained no lien on the chattels whatsoever. Three facts stand out in bold relief in this case: First, that plaintiff took the property from the possession of the sheriff, who was holding it for defendant under the attachment, for the express purpose of foreclosing its lien under the chattel mortgage; second, that it never made any attempt to

foreclose the mortgage for over six years, but suffered the property to be controlled by Morrison, who was its agent; third, that because of this delay it has lost the security of such property, and has, therefore, failed to realize on its debt a large sum of money, which, if realized, would to that extent have relieved the Dakota land of the lien of plaintiff's mortgage thereon prior to defendant's lien under the attachment, and the judgment subsequently rendered in its favor.   The plaintiff is chargeable with the value of these chattels, with interest thereon from the time it took them (it never having made any effort to foreclose its mortgage,) unless the pendency of the replevin action excused it from proceeding with the foreclosure, or unless we can find as a fact that defendant agreed that plaintiff need not foreclose the chattel mortgage during the time the contest relating to priority remained unsettled.   The only ground on which plaintiff can claim that the pendency of the replevin suit justified its nonaction is that it would be bound, in case of defeat, to return the property to the sheriff, the defendant in that action, to the end that he might proceed to sell the same on execution issued upon the judgment in the case; and that, if it had foreclosed its mortgage, the purchaser or purchasers on the sale would not have obtained a clear title to the property sold.   Of course, if plaintiff were not, while the replevin action was pending, in position to give an unincumbered title on the foreclosure of the mortgage, the law would not require it to make such foreclosure during that period. And it must be conceded that there is strong authority for the proposition that, when the parties to a replevin action are litigating the question of title, neither party in whose possession the property remains *pendente lite* can transfer good title to a third person.   *Lockwood* v. *Perry*, 9 Metc. (Mass.) 440; *Hunt* v. *Robinson*, 11 Cal. 262; *White* v. *Dolliver*, 113 Mass. 402; *Bruner* v. *Dyball*, 42 Ill. 34; *Farnham* v. *Chapman*, (Vt.) 14 Atl. 690.   See, also, *Lovett* v. *Burkhardt*, 44 Pa. St. 174; Wells Repl. § 470; Cobbey, Repl. §§ 721, 722.   When there is a contest over the title to personal property, much can be said in favor of the rule

that the party to the litigation who retains possession *pendente lite* should not have the power to devest the .title of the rightful owner by a sale while the question of title is being judicially investigated between the parties to the replevin action. The argument applies with peculiar force to the case in which the true owner is the plaintiff. He is powerless to prevent the rebonding of the property by the defendant. And yet he may be seeking to recover property that he is particularly desirous of possessing, and it may be a grievous wrong to deprive him of the right to secure possession thereof. But if the mere fact that the defendant· in a replevin action has the custody of the property *pendente lite* (and he can always have it, if he so pleases) invests him with the right to transfer a good title thereto to a stranger, the plaintiff, by instituting the replevin suit, has, so far as possession and title are concerned, actually placed himself in a worse position than he would have occupied had he not sued at all. Before he commenced his action, the defendant could not give another a good title to the property. But, after he rebonds, he can do so, provided the sound rule be that in such cases the party holding possession while the action is pending can, by sale, cut off the owner's rights to the specific chattel. The decided weight of authority is against this doctrine. See cases above cited. But there are cases which support the contrary rule. *Stewart* v. *Wolf*, (Pa. Sup.) 7 Atl. 165; *Bain* v. *Lyle*, 68 Pa. St. 64; *Gray* v. *Wilson*, 4 Watts, 39. See also, *Gordon* v. *Jenny*, 16 Mass. 465; Wells, Repl. § 465; *Taylor* v. *The Royal Saxton*, 23 Fed. Cas. 797–802. When, however, the defendant fails to rebond, there may be some force in the proposition that he has thereby elected to rely upon the security of the bond given by the plaintiff. He has an option whether he will rely upon the bond or take the property, while the plaintiff has no such option. It would be sufficient for the purposes of this case to hold that the defendant in replevin can never pursue the property in the hands of a third person, to whom the plaintiff sells it *pendente lite*, while it is in his possession in claim and delivery proceedings. But we are not prepared to lay

down that rule in this case. It is sufficient to place our decision on this phase of the case on another ground. When the party to the replevin suit, who is not in possession of the property during its pendency, has only a lien thereon, and is not entitled to the possession of the property generally as owner, but only for the purpose of enabling him to enforce his lien thereon, and the other party to the action has a right therein as owner, or as the holder of an inferior lien thereon, it is obvious that; if the party who is not in possession is successful, he has no right to have the property delivered to him as an owner would have. He is merely seeking to enforce a lien thereon. As security is all he is after, there is no reason why the replevin bond should not take the place of the property itself. As security it is as good as the property, and, after he has obtained a substitute security as adequate as the original, there is no reason why the owner of the property should be further embarrassed in dealing with the property, or why the holder of an inferior lien thereon should not thereafter be permitted to proceed to enforce his lien, the same as though the other lien had been extinguished. Indeed, when the action is between the owner and a lienholder, or between two lienholders, the money judgment in favor of the lienholder is never for the full value of the property, if that exceeds the sum due upon his lien, but only for the amount of his lien. *Wolfley* v. *Rising*, 12 Kan. 535; *State* v. *Kinkaid*, 23 Neb. 641, 37 N. W. Rep. 612; *Dodge* v. *Chandler*, 13 Minn. 114 (Gil. 105;) *Booth* v. *Ableman*, 20 Wis. 23; *Hayden* v. *Anderson*, 17 Iowa, 158; *Kerr* v. *Drew*, 90 Mo. 147, 2 S. W. Rep. 136; *Wheaton* v. *Thompson*, 20 Minn. 196, (Gil. 175;) *Jones* v. *Hicks*, 52 Miss. 682; *Lyle* v. *Barker*, 5 Bin. 457; *Benjamin* v. *Stremple*, 13 Ill. 468; *Kennedy* v. *Whitwell*, 4 Pick. 466. In such a case he has no right to secure possession of the property, provided the other parties offers to pay the amount of the judgment in his favor. The main object of his action is to recover his debt. The possession of the property is merely an incidental matter. In the replevin action brought by the plaintiff against the sheriff, and therefore virtually against the

defendant, the attaching creditor, the sheriff (had the priority of the attachment lien been sustained) could have had an alternative judgment only for the amount of the defendant's claim against Morrison. It is true that in that particular case that claim greatly exceeded the value of the property. But it might have been much less. The property was worth $6,000. If the defendant's claim had been only a few hundred dollars, it is clear that the alternative judgment for money would have been for only the amount of such claim, and the plaintiff could have retained possession of the property by paying such money judgment. As against the plaintiff in the replevin suit, the defendant therein (representing the defendant herein) was not entitled absolutely to the possession of the property but only as security for the lien of the attachment, and when the bond was given by plaintiff, and accepted by defendant as sufficient, he assented to a change of security, and thereafter the plaintiff was at liberty to proceed with the foreclosure of its mortgage without reference to the attachment lien thereon. As to a purchaser at such a foreclosure sale, the lien would be gone, the bond standing in place of it. There seems to be absolutely no controversy among the decisions touching the right of the plaintiff in this action, after it had secured possession of the mortgaged property in the replevin suit, to foreclose its mortgage, and by such foreclosure transfer a good title to the purchaser at the foreclosure sale, free from the attachment lien. Since the early case of *Bradyll* v. *Ball*, 1 Brown, Ch. 427, decided in 1785, the rule has been that, as against a person who is merely seeking to obtain possession to enforce a lien on the property (whether he is the plaintiff in the suit or the defendant asking for a return of the property seized by the plaintiff therein,) the party in possession may dispose of the property *pendente lite*, and that thereafter the holder of the lien must look to the bond for protection. *Speer* v. *Skinner*, 35 Ill. 282, 300; *Woglam* v. *Cowperthwaite*, 2 Dall. (U. S.) 68; *Frey* v. *Leeper*, *Id*. 131; *Acker* v. *White*, 25 Wend. 614. See Wells, Repl. § 649. In some of the cases in

which it has been decided that, when the contest is over title to property, the party who holds the property during the pendency of the litigation cannot, while in possession, transfer title to a third person, the principle is recognized that the one seeking to secure possession merely to enforce a lien is not entitled to the protection of this rule. In *Bruner* v. *Dyball*, 42 Ill. 34, the court said: "In the case of *Speer* v. *Skinner*, 35 Ill. 282, it was held that a landlord who had distrained goods of his tenant for rent in arrear lost his lien on the goods when they were replevied by the tenant, and it is now urged that the principle announced in that case governs this. In such a case the landlord does not claim to own the property, but simply to hold it by a lien as security for his debt. He only, by the distress, changes the custody of the property to enforce his lien. He has rightfully reduced it to possession in enforcing his lien, but the ownership of the property is not changed by the distress, but simply the possession. The ownership, in such a case, is only changed by a sale of the property. The tentant has the right to repossess himself, under the law, by discharging the debt for the rent, thereby extinguishing the lien of the landlord, and thus prevent a sale. Or, if he choose, he may contest the landlord's claim and repossess himself of the property by an action in replevin. And when he resorts to the latter course he is required to give bond with security for the return of the property in case he fails in his action, and this bond the law substitutes for the landlord's lien. Before, he held a lien on the property as security for the rent in arrear; but the tenant, by executing the replevin bond, releases the property from the lien, and the bond becomes a new security; and, if the tenant fails in his action, the landlord's only action is on the replevin bond. But it is believed that such a rule only applies to cases where property is held by the defendant under a lien, and as a security for the payment of a debt, or the performance of some other duty, and the plaintiff in replevin substitutes the replevin bond as security, in lieu of the lien held for the same purpose. And where a party simply

has a lien on property, there is no hardship in remitting him to the security which the replevin bond affords, but it would be otherwise where the suit is brought to test the right of property." See, also, *Lockwood* v. *Perry*, 9 Metc. (Mass.) 440. Our conclusion is that plaintiff had a perfect right, and that it was its duty, to proceed with diligence to foreclose its mortgage as soon as it secured possession of the mortgaged property in the replevin action. It was for this specific purpose that it took the property from the sheriff, who was holding it for the defendant therein, which was the plaintiff in the action in which it was attached. Having wrested the possession from the sheriff on a claim of priority of lien to enable it to enforce such prior lien, it was bound to do nothing to injure the rights of the defendant as the holder of an inferior lien thereon. The plaintiff has at all times conceded that defendant held a lien on these chattels subject to its mortgage, and it knew of such lien, and of its second lien on the Dakota land, when it commenced its replevin action. Sound principle, authority, and the claims of justice combine to support the doctrine that under the facts of this case the plaintiff is accountable to the defendant (so far as the question of priority of lien is concerned) for the value of this chattel property at the time it was taken, with interest thereon at the legal rate, unless the evidence in this case shows an assent by defendant that no foreclosure should take place while the replevin action was pending. See *Moody* v. *Haselden*, 1 S. C. 129; *In re Haake*, 2 Sawy. 231, Fed. Cas. No. 5,883. We consider this point as too plain to require the citation of authorities. Common honesty demands that when one who holds a first lien on chattels and real property knows of a second lien upon the real property, he must so proceed with respect to the chattel security as to make as much as possible from such security, to the end that the burden of his prior mortgage on the land may be lessened. The plaintiff, by its laches with respect to the chattel property, has suffered it to become lost as security to it and to the defendant, although it is responsible for the loss of defendant's control thereof, and was

entitled to proceed to collect its claim out of such property the moment it secured possession in the replevin action.

Did the defendant, through its attorney, Judge Emery, who appears to have had full charge of the whole matter, agree that the plaintiff need not foreclose its mortgage until the happening of two events in the future,—the decision of defendant's case against Morrison in its favor, and the trial of the question of priority of lien in the replevin suit? We have very carefully studied the evidence on this branch of the case, and have reached the conclusion that there is practically no dispute about the facts Col. Ball, one of the attorneys for the plaintiff through all the various stages of this long contest between plaintiff and defendant, admits that he never had any express agreement with Judge Emery, who represented the defendant, to the effect that the plaintiff need not foreclose its mortgage until all these mooted questions had been finally settled. The utmost scope of his evidence is that it was talked over between him and Judge Emery that plaintiff could not foreclose during the pendency of these two law suits. Judge Emery distinctly testifies that there was no agreement that plaintiff should not foreclose until after these cases had been disposed of. He says: "There never was any talk at any time between Mr. Ball and myself, or anybody else, with regard to what should or should not be done, or could or could not be done, as to foreclosing that mortgage, and to my knowledge there was no understanding whatever in regard to the the further disposition of that property; at least none that I participated in, or ever talked about with Mr. Ball, or any one else. I never had any arrangement with Mr. Ball, and never agreed with him, that they should delay the foreclosure of the mortgage until the result of the litigation between the Moline, Milburn & Stoddard Company, and Hughes, *et al*, should be determined, and emphatically never had made any arrangement or understanding or had any agreement that the foreclosure of the mortgage should be delayed until the result of litigation should be decided in the replevin suit. I never had any under-

standing or agreement with Mr. Ball that, as a matter of fact, they could not foreclose until the result of the litigation could be known.　Never had anything in substance or to the effect of that. Mr. Ball and I confined our agreement entirely to the question of rebonding, or not rebonding, replevying or not replevying; nothing about the mortgage." On the trial of the replevin action itself Col. Ball was sworn as a witness, and stated that the reason why foreclosure of the mortgage had not at that time taken place was that he had advised the plaintiff that it could not be done.　The evidence of Col. Ball on this point was as follows: "I am one of the attorneys for the plaintiff in this action.　Q. You may state to the court what you have had to do with the interests of the bank in respect to the foreclosure of the mortgage on this personal property.　A. Well, after the attachment suit was commenced, the bank employed my firm to look after its interest, in view of the fact that I had had mortgages on this same property myself in this suit, and under my advice the suit was instituted in replevin, to get the property from the sheriff, who had been claiming to hold a lien under his attachment from the fall of 1887.　At the time when the suit was actually commenced, which I think was in the spring of 1888,—when the suit was commenced,—Mr. Emery, a representative of the Moline, Milburn & Stoddard Company, one of the defendants in this action, and myself entered into an agreement, which I am not sure whether it was reduced to writing or was oral, to the effect that, if we would give a good replevin bond, no rebonding would be made, but that they would stand upon the bond.　There was never any rebonding made, and after the commencement of this suit the coroner took possession of the property, and I thereupon advised the bank that it would not be safe,— advised the bank that no foreclosure of that mortgage on this personal property could safely be made until this suit was terminated.　At that time no one anticipated that this suit would be of such long standing.　Following my advice, no foreclosure was commenced, awaiting the conclusion of this action.　It was a matter that was intrusted to me and my

firm, and the foreclosure was not made for the reason that we deemed it advisable to await the adjudication of the question as to who had the right to the possession of the property. That is the reason no foreclosure was made. Q. Have any foreclosure proceedings been begun? A. No, sir; no foreclosure proceedings have ever been begun, and for that reason." It will be noticed that no reference is here made to any agreement that the bank need not or should not sell. The only explanation offered by him why there had been no foreclosure was not that it was agreed that there should be no foreclosure, but that he thought it would not be safe so to do, and so advised his client. In the course of this evidence of Col. Ball above quoted it appears that he stated that when the replevin suit was brought Judge Emery entered into an agreement with him that Judge Emery's clients would not rebond, but would stand upon the plaintiff's bond in replevin. This evidence would indicate that the defendant herein intended to look to the security of the bond, and not to the property itself, in case it should be successful in the replevin action. This was a very natural solution of the problem, as defendant had no reason for retaking the property, provided a sufficient bond was put up in its place. Having received such a bond, it was entirely reasonable that the attorney for defendant herein should agree just as Col. Ball testifies that he did agree, "to stand upon the bond." We think a fair construction of Col. Ball's evidence is that there was a talk about the advisability of foreclosing *pendente lite*; but that there was no assent on the part of the defendant that plaintiff should not sell until after the termination of all the pending litigation. It appears that Judge Emery had come to Fargo for the purpose of applying for an order to sell some of the attached property as perishable, under § 5001, Comp Laws. Col. Ball appears to have had the impression that Judge Emery presented his motion, and was defeated thereon. But Judge Emery denies this, and the absence of any evidence of a record of such a motion confirms the testimony of Judge Emery.

Indeed, he is not positively contradicted by Col. Ball on this point. The greater portion of this property consisted of horses and stock, and was perhaps "perishable" property, within the meaning of the statute. See 1 Shinn, Attachm. § 262, and cases cited. At any rate, from Judge Emery's standpoint, here was a means of protecting his client against the risks incident to the holding for perhaps a long period of time of a class of property which might all die before the action against Morrison could be tried. His attitude at that time was that he did not care or propose to incur the hazard of waiting until some future day to sell this property. This attitude must have been evident to counsel for the plaintiff. That it was evident to him is apparent from the testimony of Judge Emery, which is not controverted by Col. Ball, that he said to Col. Ball that the property was perishable, that it was liable to depreciate in value and deteriorate, and that, if the bank would give a good bond in replevin, Judge Emery's clients would not rebond. From Judge Emery's standpoint, he could sell most of this property as perishable. This would cut off the plaintiff's lien thereon. *Young* v. *Keller*, (Mo. Sup.) 7 S. W. Rep. 293; *Betterton* v. *Eppstein*, (Tex. Sup.) 14 S. W. Rep. 861; *Meyer* v. *Sligh*, (Tex. Sup.) 16 S. W. Rep. 1022; *Megee* v. *Beirne*, 39 Pa. St. 50; *Taylor* v. *Carryl*, 24 Pa. St. 267; 1 Shinn. Attachm. § 262; 1 Wade, Attachm. § 27. Thereafter the plaintiff's lien would be transferred to the proceeds of the sale, and it could, of course, hold the sheriff and his bondsmen, as well as the plaintiff in the attachment action, for the conversion of the property if its lien was prior to that of the attachment. By a sale Judge Emery could fully protect his clients against the ravages of time among this large herd of horses and cattle. He could see to it that the property should bring a fair figure, or buy it in at less than value. And thereafter, whatever the result of the litigation might be, his clients would be saved all possible loss from the death of this live stock. Should defendant recover judgment against Morrison, and defeat plaintiff's claim to priority of lien, it would have this fund to resort to for payment. Should

the plaintiff be successful, it could turn over this fund to plaintiff to apply on the plaintiff's prior lien, thereby extinguishing to that extent the amount due on the real estate mortgage held by plaintiff, and thus rendering defendant's security better, or keep it to reimburse itself in case plaintiff compelled it to pay for the conversion of the property. Whatever might be the outcome of those cases, a sale of this property as perishable would be very advantageous to the defendant. For what, then, did Judge Emery surrender this right, as he regarded it? It is incredible to us that he should deliberately abandon his purpose, and agree that this very perishable property might, after years of litigation, be turned back to defendant, as the successful party in the replevin suit, a mere fragment and wreck. That this was not his purpose, and that Col. Ball could not have understood it to be his purpose, is apparent from the following evidence of Judge Emery, which is not disputed in the case: "We then talked over the question of rebonding the property or replevying the property, and I said to Col. Ball: 'This property is perishable. It is liable to depreciate in value, and deteriorate. If you will give us a good bond in replevin,—one that is good, and we can approve, —we will not rebond the property.' Mr. Ball said that they would do so, and thereafter, as he stated, made arrangements with Rush Adams and one other to sign the bond." What Judge Emery was seeking to guard against, and what Col. Ball knew he was seeking to guard against, were the risks incident to being obliged to look to this property to make defendant's claim at some other time when it might all be dead. And yet this very risk would be incurred by defendant if plaintiff was to hold the property while this litigation was going on. Here were two liens on the same property. The defendant could not enforce its lien because it had not yet secured judgment. But the plaintiff was in position to foreclose its lien at once. What more natural than that the party entitled to enforce its lien should proceed to do so, leaving the question of priority open to litigation? Plaintff, in the event of ultimate defeat, would be liable for only the value of

of the property and interest. By taking care that it was not sold at a sacrifice on the foreclosure sale, it could practically protect itself against all loss by reason thereof. When we consider all the surrounding circumstances, the fact that Col. Ball disclaims any express agreement on the subject of refraining from foreclosing the mortgage, and the fact that Judge Emery is emphatic in his testimony that no such agreement was made, we are of opinion that plaintiff did not secure from defendant such an agreement as would protect it in not proceeding with the foreclosure of its mortgage, as it had the right, and was bound, to do, and could do without subjecting itself to serious risk. Nor is the course of plaintiff's counsel in not foreclosing inexplicable on any other theory than that of an express agreement that he need not do so. No branch of the law is more complicated than that which relates to actions of replevin. At the time plaintiff's counsel deemed it safer not to foreclose there was no decision in this state on the point whether the sale would devest the lien of the attachment if it was found to be superior to that of this mortgage. Indeed, there was very little law in the books on this subject. Counsel might well deem it a safer course for his client, under all the circumstances, to leave everything in *statu quo* for a season, hoping for a speedy determination of the controversies which were embarrassing him. But under the inexorable rule that every one must know the law, there is imputed to his client a knowledge of its right, and therefore of its duty, to immediately enforce its lien by foreclosure. Having failed in this duty, it must so far as the question of priority of lien is concerned, account to the defendant Moline, Milburn & Stoddard Company, for the value of this chattel property, found by the court to be $5,000, together with the interest thereon from May, 1888, when it took possession of the same, at the legal rate of 7 per cent. to April 6, 1894, when the amount of plaintiff's first lien on this land was reduced by the application of the proceeds of the sale of the Algoma real estate to the sum of $4,099.83. Applying the value of this property, with interest, to the balance for

which the plaintiff's mortgage was a first lien on the Dakota land, such lien is utterly wiped out, so far as it takes precedence of the defendant's lien under its attachment and the judgment in that action. Of course, the plaintiff's mortgage is not extinguished as a lien on this land as against the defendant Morrison. It is merely postponed to the lien of the defendant Moline, Milburn & Stoddard Company under its attachment and judgment. The amount of plaintiff's lien on the property is found to be $10,761.22 on the 13th of February, 1897. No complaint is made by defendant Morrison with respect to this amount. The plaintiff is therefore entitled to the usual decree of foreclosure and sale, but the land will be sold subject to the judgment lien of the defendant Moline, Milburn & Stoddard Company, which is hereby established as a prior lien on the land described in the complaint for the sum of $17,658.18, with interest thereon at 7 per cent. from February 27, 1891. But the defendant Moline, Milburn & Stoddard Company is not content with what it regards as only a partial victory. It insists that it should have a money judgment against the plaintiff. The ground of its contention is as follows: After applying the value of the chattel property in extinguishment of the balance for which plaintiff's mortgage was a first lien thereon and on the Dakota land, there appears to be a sum not exhausted by such application. To this extent defendant claims that its second lien on these chattels was a valuable interest therein, and that, having been deprived of such interest by the wrongful act of the plaintiff, it must respond to defendant in damages, on the theory of a liability to be enforced by an action in the nature of an action on the case for injury to their lien. Under the pleadings, we think that defendant is in position to make this claim. Nor do we find any obstacle to its doings so in the fact that this is an action in equity to foreclose a mortgage. In the course of adjusting the equities of the parties it becomes necessary to inquire into and to take account of the plaintiff's breach of its equitable obligation to the defendant, and the same negligence on its part which entitles defendant to charge against its

prior lien on the land the value of the chattel property; also gives it a right to hold plaintiff responsible for the damages thereby caused its second lien on such property. It is axiomatic that when a court of equity assumes jurisdiction it will do full justice between the parties, although it becomes necessary to administer relief ordinarily secured in an action at law. But the great difficulty with the position of counsel for defendant is that they have not proved that defendant has been damaged by the action of the plaintiff in suffering property on which it held a lien to be lost. It does not follow that, because defendant has lost a lien on these chattels, therefore it has suffered any injury whatsoever. The land on which it holds a lien may be ample security for its claim. There is no proof as to the value of such land. Unlike an action for conversion, an action on the case for damages to security is not made out by fixing the value of the property lost, but the plaintiff in such action must go further, and show that his remaining security is inadequate. If this section of land is worth $30,000, it would be very unjust to allow the defendant to compel the plaintiff to pay damages, when it has not in fact been injured at all. On this point the decisions are uniform and clear. *Hull* v. *Carnley*, 17 N. Y. 204; *State* v. *Weston*, 17 Wis. 107; *Marsh* v. *White*, 3 Barb. 518; *Manning* v. *Monaghan*, 23 N. Y. 545, 28 N. Y. 585. See, also, *Lane* v. *Hitchcock*, 14 Johns. 213. The plaintiff did not become liable to defendant for the full value of the property as for a conversion. The wrong done to it was in impairing its security by negligently permitting the property to be lost while under the plaintiff's control. But defendant's security embraced other property, and, until the inadequacy thereof to pay its lien is shown, there is no evidence that defendant has in fact been damaged at all. Indeed, there is evidence that this land is worth a great deal more than the judgment. Plaintiff's cashier testified as follows: "At that time the value of the Morrison homestead was, in round numbers, about $5,000. I understand that the Dakota property was worth anywhere from $30,000 to $35,000. I do not know the value of Morrison's prop-

erty aside from the Dakota property." Deducting from this the value of the personal property, and the section on which defendant holds a lien for about $18,000 is shown to be worth at least $25,000. There is no evidence to the contrary in the whole case. Our conclusion is that defendant Moline, Milburn & Stoddard Company is not entitled to a money judgment against the plaintiff.

The District Court will vacate the judgment heretofore rendered in this case, and enter judgment in favor of the plaintiff against the defendant James Morrison for $10,700.22, with interest thereon from February 23, 1897, at 7 per cent., and the usual foreclosure judgment for the sale of the land described in the complaint to satisfy such judgment. The rights of all the defendants except Moline, Milburn & Stoddard Company will be adjudged to be subordinate to the lien of the plaintiff's mortgage, and to be barred by the foreclosure and sale of the premises under such judgment. But the defendant Moline, Milburn & Stoddard Company will be decreed to have a lien on said premises superior to that of the plaintiff's mortgage for the full amount due upon such judgment, to-wit, $17,658.18, with interest thereon from February 27, 1891.

Defendant Moline, Milburn & Stoddard Company will recover costs and disbursements in this court. All concur.